1    DANIEL M. ORTNER, No. 329866
      dortner@pacificlegal.org
2    ETHAN W. BLEVINS, Wash. Bar No. 48219*
      eblevins@pacificlegal.org
3    Pacific Legal Foundation
      555 Capitol Mall, Suite 1290
4    Sacramento, CA  95814
      Telephone: (916) 419-7111
5    Facsimile: (916) 419-7747
      *Attorneys for Plaintiff Elizabeth Weiss*
6    *pro hac vice admission pending*

7

8            UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10            SAN JOSE DIVISION

11    ELIZABETH WEISS,           No. _____

12          Plaintiff,        **COMPLAINT FOR**
                         **DECLARATORY JUDGMENT**
           v.             **AND PERMANENT AND**
13                       **PRELIMINARY INJUNCTIVE RELIEF**
   STEPHEN PEREZ, in his official
14    capacity as Interim President of
      San Jose State University;
15    VINCENT J. DEL CASINO, in his
      official capacity as Provost of
16    San Jose State University; WALT
      JACOBS, in his official capacity as
17    Dean of the College of Social Sciences
      at San Jose State University;
18    ROBERTO GONZALES, in his
      official capacity as Chair of the
19    Department of Anthropology at
      San Jose State University;
20    CHARLOTTE SUNSERI, in her
      official capacity as NAGPRA
21    Coordinator at San Jose State
      University; and ALISHA MARIE
22    RAGLAND, in her official capacity as
      Tribal Liaison at San Jose State
23    University,

24          Defendants.

25

26

27

28

**INTRODUCTION**

1.       San Jose State University (SJSU or University) has embarked upon a poorly disguised campaign of retaliation against Professor Elizabeth Weiss because University officials do not approve of her viewpoint on a controversial academic issue relevant to her field of study, physical anthropology.

2.       When some of Professor Weiss's writings and other academic expression provoked controversy on Twitter and among her colleagues, University officials responded by denying her access to the University's collection of skeletal remains, which she has long used and requires for her research. Defendants also prohibited her from taking x-rays and photographs of these remains, a practice essential to her research and writing. They further eliminated or substantially diminished Professor Weiss's academic position as a curator for the remains. And lastly, she has been publicly tarred as a racist by University officials, who have threatened her with disciplinary action or other forms of retaliation if she dares to teach her views to her students in the future. The University wrongly claims that its actions are a viewpoint-neutral attempt to comply with state law governing the treatment of Native American remains.

3.       Professor Weiss's writings, research, and expression in and outside the classroom are protected by the First Amendment. The Supreme Court has long held that freedom of expression "is nowhere more vital than in the community of American schools," *Shelton v. Tucker*, 364 U.S. 479, 487 (1960), and that the First Amendment "does not tolerate laws that cast a pall of orthodoxy over the classroom." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 603 (1967). After all, "[s]cholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die." *Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 250 (1957).

/ / /

4.      Defendants, all of whom are administrators, officers, or employees at SJSU, have taken retaliatory actions against Professor Weiss because of her academic research and writing and her desire to introduce her students to her academic perspective about laws requiring that Native American remains be returned to their affiliated tribe. Defendants' actions are contrary to the guarantees of the First Amendment.

## JURISDICTION AND VENUE

5.      The claims in this action arise under the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. The Court has jurisdiction over these federal claims under 28 U.S.C. § 1331 (federal question) and § 1343(a) (redress for deprivation of civil rights).

6.      Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1)–(2), because this lawsuit concerns retaliatory actions taken by officials at SJSU, which is located within this district.

## PARTIES

8.      Plaintiff Elizabeth Weiss is an individual citizen of the United States who lives in San Jose, California.

9.      Stephen Perez is the interim president of SJSU and is responsible for retaliatory actions taken against Professor Weiss. He is sued solely in his official capacity.

10.      Vincent J. Del Casino is the Provost of SJSU and is responsible for retaliatory actions taken against Professor Weiss. He is sued solely in his official capacity.

11.      Walt Jacobs is the Dean of the College of Social Sciences at SJSU and is responsible for threats and retaliatory actions taken against Professor Weiss. He is sued solely in his official capacity.

12.     Roberto Gonzalez is the Chair of the Department of Anthropology at SJSU and is responsible for threats and retaliatory actions taken against Professor Weiss. He is sued solely in his official capacity.

13.     Charlotte Sunseri is the Native American Graves Protection and Repatriation Act (NAGPRA) Coordinator at SJSU and is responsible for retaliatory actions taken against Professor Weiss. She is sued solely in her official capacity.

14.     Alisha Marie Ragland is the Tribal Liaison at SJSU and is responsible for retaliatory actions taken against Professor Weiss. She is sued solely in her official capacity.

**FACTUAL ALLEGATIONS**

*Professor Weiss's Curational Duties at SJSU*

15.      Professor Weiss is a full, tenured professor of physical anthropology at San Jose State University. She specializes in osteology—the study of human skeletal remains.

16.     Since her appointment in 2004, Professor Weiss has served as SJSU's Collections Coordinator.

17.     As Collections Coordinator, Professor Weiss is in charge of establishing protocols for and facilitating research of SJSU's extensive collection of skeletal remains. As her appointment letter defining her job explains: "You will take responsibility to curate and manage the department's human osteological collections, in consultation with the department chair. All management will be in compliance with NAGPRA and California State guidelines and in consultation with the appropriate culturally affiliated groups." Furthermore, the "maintenance of the collection is [her] chief departmental service requirement."

18.     SJSU's collection includes Native American remains subject to NAGPRA, which grants tribes the right to claim possession of Native American remains through a process called repatriation, as well as non-Native American remains and non-human remains. SJSU also stores x-rays of remains in the curation

facility. In her research and curatorial responsibilities, Professor Weiss has always complied strictly with NAGPRA and the California Native American Graves Protection and Repatriation Act (CalNAGPRA). She has ensured that researchers communicated with members of the relevant Indian tribes, such as the Muwekma Ohlone tribe, to ensure culturally appropriate research.

*The Controversy Over Professor Weiss's Book and Social Media Posts*

19.    In 2020, Professor Weiss published a book, Repatriation and Erasing the Past, which criticizes NAGPRA and similar state laws that require universities and museums to surrender Native American skeletal remains to tribal descendants. Professor Weiss and her co-author James Springer argue in the book that such laws undermine objective scientific inquiry and violate the Establishment Clause of the United States Constitution by favoring religion over science.

20.    The book ignited controversy among academics and on social media. About a thousand professors and graduate students, including some of Professor Weiss's colleagues, signed an open letter condemning the book as "anti-indigenous" and "racist" for arguing that indigenous communities should not be given exclusive or preferential control over remains of general scientific interest. No similar claims of racism had been leveled by peer reviewers or the publisher. Moreover, Professor Weiss is not alone in her field regarding her views on repatriation of remains.

21.    Professor Weiss has made similar arguments about repatriation for years without controversy at SJSU. In fact, she was commended just a few years ago by Defendant Roberto Gonzalez, the chair of the SJSU Anthropology Department, for her ability to "spark lively discussions among various stakeholders" and to "boost the department's national reputation as a center that fosters creative and unorthodox viewpoints on important issues." And in 2019, the SJSU College of Social Sciences gave her the Austin D. Warburton Award of Merit.

22.    But Professor Weiss has faced an escalating series of threats and retaliatory actions taken by Defendants since the book's publication.

23.     After a social media campaign aimed at shaming the University for supporting Professor Weiss, Defendant Jacobs, the Dean of the College of Social Sciences, hosted a Zoom event in early June 2021 for deans and chairs entitled "What to Do When a Tenured Professor is Branded a Racist." The event was attended by many others because it did not require a password for attendance and was not closed to the public.

24.     Throughout the hour-long event, several University administrators present, including Defendant Gonzalez, repeatedly branded Weiss a white supremacist, and one even compared her views on repatriation to lynching. Defendant Jacobs, who hosted the event, remained silent and did not dispute any of this calumny.

25.     Defendant Gonzalez expressed regret that Weiss was tenured and implied that he would take adverse action against her if she were not. He also suggested that she was "professionally incompetent," which is a predicate for revoking her tenure, and he agreed with a colleague that it would be "unethical" to allow her to teach her views to students.

26.     Defendant Gonzalez stated during the meeting that he would try to penalize or prevent Weiss from teaching her viewpoint in the classroom. He then stated that while he could not do anything about her employment status until her tenure review came up several years down the road, he would take a "very different approach" if she tried to teach the subject in class the following semester.

27.     Professor Weiss has long taught about repatriation in her classes and plans to continue to do so. In particular, this topic features centrally in her classes on Bioarcheology and Human Osteology. Professor Weiss is scheduled to teach her course on Bioarcheology in the Spring semester of 2022. As she has always done, Professor Weiss plans to expose students to the topics raised in her book as well as to contrary viewpoints. She wants to encourage her students to think about and debate the tradeoffs when we remove historically and scientifically significant objects from the realm of study.

28.     Concerned about what she heard during the Zoom event, Professor Weiss asked Defendants Gonzalez and Jacobs for a letter assuring her that her ability to assign her book, to speak about her research in class, and to access skeletal remains for research purposes would not be restricted. She also asked that Defendant Gonzalez retract his threats to act against her. Defendant Jacobs informed Professor Weiss that Defendant Del Casino and the Office of Faculty Affairs would not let him provide her a letter and that Defendant Gonzalez would not retract his statements. He also told Professor Weiss that he was receiving pressure from others to take action against her.

29.     Counsel for Professor Weiss sent a letter on her behalf addressed to Defendants Del Casino, Jacobs, and Gonzalez on August 19, 2021. The letter warned SJSU that any retaliatory actions taken against Professor Weiss would violate her First Amendment freedoms and specifically warned the University not to take any action barring Professor Weiss from accessing SJSU's collection of skeletal remains.

30.     The University, however, did not heed this warning and began its retaliatory campaign after Professor Weiss continued to express herself in writing and on social media.

31.     On August 31, 2021, Professor Weiss published an op-ed in The Mercury News and East Bay Times laying out her critique of the newly enacted AB 275, which amends CalNAGPRA. Professor Weiss critiqued the amendments with the same arguments raised in her book. Soon after the op-ed was published, the University received multiple vitriolic emails from members of the public and academic critics with demands for discipline or termination.

32.     Further controversy ensued after September 18, 2021, when Professor Weiss tweeted a picture of herself holding a skull from the SJSU collection with the text, "So happy to be back with some old friends," expressing her excitement at being able to return to the collection after a pandemic-induced absence. She and other renowned anthropologists and journalists have frequently posted similar images of scientists holding skeletal remains without controversy. Indeed, the Anthropology

1   Department of SJSU had several similar pictures up on its website at the time of

2   Professor Weiss's tweet. And in March 2021, the SJSU newsroom published an article

3   honoring the recipients of 2021 faculty awards, which contained an extremely similar

4   picture of another SJSU professor holding a skull and smiling. Nevertheless, Professor

5   Weiss's tweet sparked more letters to the University and social media posts calling for

6   the University to remove or otherwise retaliate against her.

7       33.   On September 29, 2021, Provost Del Casino published a letter to the

8   University community which declared that the tweet "ha[d] evoked shock and disgust

9   from our Native and Indigenous community on campus and from many people within

10  and outside of SJSU." Del Casino claimed there were "many things in the image itself

11  that do not align with the values of SJSU or of academic inquiry." Del Casino further

12  claimed that this image was contrary to "the ethical guidelines of the social science

13  disciplines that govern such practices and laws such as AB 275."  Del Casino also

14  declared that SJSU "does not condone or endorse the practice of posing with the

15  human remains of others."

16      34.   In response, Professor Weiss sent an email out to the University

17  community which explained that her handling of the remains and her photograph was

18  consistent with University practice and was not inconsistent with either NAGPRA or

19  CalNAGPRA.

20      35.   The same day that Defendant Del Casino published his letter, Kimberly

21  Robertson, a Professor of American Indian Studies at California State University,

22  Long Beach, and a member of the Muscogee (Creek) Nation, wrote a letter addressed

23  to the Native American Heritage Commission (the body that oversees repatriation of

24  remains), the SJSU administration, and representatives of area tribes. The letter

25  demanded that the University remove Weiss from her post and bar her from further

26  interaction with the human remains at SJSU because of her academic viewpoint on

27  repatriation and her photograph placed on social media. Unfortunately, the

28  University would soon take many of the actions that Ms. Robertson demanded.

1

*The University's Directive Targeting Professor Weiss*

2      36.     In clear retaliation against Professor Weiss for her viewpoint on

3  repatriation laws, on October 6, 2021, the University announced a new Interim

4  Presidential Directive regarding the curation facilities holding SJSU's skeletal

5  remains. The directive bars Professor Weiss from accessing the remains that she has

6  curated for more than 17 years and places control over access exclusively in the hands

7  of the University's NAGPRA Coordinator and a newly appointed Tribal Liaison.

8      37.     The directive, entitled "San Jose State University's Interim Protocol for

9  Curation Spaces in Alignment with NAGPRA, CalNAGPRA, AB 275 (Interim

10 Presidential Directive, PD-2021-03)" sets out four restrictions on the curation space

11 housing SJSU's skeletal collection:

12
- The curation spaces at SJSU that house the Collections will
13 be exclusively managed by the SJSU NAGPRA Coordinator and the SJSU Tribal Liaison, supplemented by student assistants who are appropriately trained and supervised to assist with the inventory
14 process.
- The Collections will continue to remain in a locked, secure
15 area on campus, and all access will be overseen by the SJSU NAGPRA Coordinator and the SJSU Tribal Liaison.
16 - Any physical access to or use of the Collections, including for research or teaching, will require written approval of the NAGPRA
17 Coordinator and Tribal Liaison.
- Audio, video, or photographic devices are prohibited in the
18 curation spaces, as is taking photo images or videos of human remains, funerary objects, or the boxes in which these materials are held.
19

20     38.     Though defended as a neutral protocol implementing legal duties

21 regarding Native American remains, the University faced no legal duty to implement

22 the directive, and the timing of and statements related to the interim directive make

23 clear that the policy is designed to retaliate against Professor Weiss. *See Cornelius v.*

24 *NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 811 (1985) ("The existence of

25 reasonable grounds . . . will not save a regulation that is in reality a façade for

26 viewpoint-based discrimination."); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 86

27 (1st Cir. 2004) (The "mere recitation of viewpoint-neutral rationales" will "not

28 immunize [government] decisions from scrutiny," as they may be a "mere pretext for

an invidious motive. . . . In practical terms, the government rarely flatly admits it is engaging in viewpoint discrimination."). Moreover, the fact that other California universities had adopted NAGPRA policies much earlier makes it less likely that SJSU's policy was prompted solely by the passage of AB 275.

39.   As SJSU's only physical anthropologist, Professor Weiss is the only faculty member that regularly accesses and utilizes SJSU's skeletal remains collection for her research. Any actions that the University takes to restrict access to the skeletal remains directly and uniquely harm Professor Weiss.

*The Interim Policy Was Retaliatory*

40.   In response to another letter from Professor Weiss's counsel on October 26, 2021, SJSU conceded that the actions that it took to limit Professor Weiss's access to remains were the "direct result of … consultation that SJSU had with the affected tribe" as well as California's Native American Heritage Commission (NAHC).

41.   The University's reference to conversations with tribes and the NAHC is compelling evidence that its subsequent actions were retaliatory because members of these groups voiced opposition to Professor Weiss's speech and pressured the University to act against her for the viewpoint she expressed.

42.   Moreover, a recent faculty-wide email at SJSU makes it even clearer that the University bowed to pressure from those who wish to silence and retaliate against Professor Weiss for her views.

43.   On November 30, 2021, an SJSU professor circulated to a faculty listserv a letter entitled, "Statement of Support with the Muwekma Ohlone Tribe for Respectful Return of Ancestors [Repatriation] at San Jose State University and in the CSU." The letter was written by the California State University East Bay Indigenous Acknowledgment Collective, an organization of tribal members and students and faculty in the California State University System. Signatories include an assortment

/ / /

of California State University professors and at least two members of the Muwekma Ohlone Tribal Council.

44. The Muwekma Ohlone Tribe is one of the tribes advocating for repatriation of the SJSU collection, and the University has admitted that it consulted with this tribe as a prelude to acting against Professor Weiss.

45. The letter states that Professor Weiss's "actions and rhetoric [are] prime examples of colonial violence against the Muwekma Ohlone Tribe." The letter accuses Professor Weiss of "hid[ing] behind harmful and distorted notions of science and academic freedom, refusing to heed the leadership of the Native peoples, whose ancestors they dehumanize by disrespectfully treating them as artifacts and objects to collect and study." It goes on to conclude that the "Indigenous Acknowledgement Collective also supports the barring of Dr. Elizabeth Weiss from access to the remains as well as to related archaeological materials for the duration of the return of ancestors from SJSU."

46. This letter, signed by the very individuals who influenced the access restrictions placed on Professor Weiss, expressly states that the access restrictions were imposed in retaliation against Professor Weiss for her "rhetoric" regarding repatriation—i.e., her academic viewpoint.

*The Interim Policy and Its Implementation Directly Harm Professor Weiss by Denying her Access to Remains Crucial to her Research*

47. Until the directive was announced, Professor Weiss, in her role as Collections Coordinator, had overseen access to the University's entire collection of skeletal remains since her appointment in 2004 and was allowed to freely access the collection.

48. The interim directive cuts Professor Weiss out of her previous and contractually assigned leadership responsibilities for the collection and impedes her core research.

/ / /

49.     Since the directive was announced on October 6, 2021, Professor Weiss has been locked out of the curational facility. The lock and alarm codes were changed to bar her access, and her requests to receive an updated alarm code or key have been refused by Defendants.

50.     The directive does not outline any standards to guide the discretion of the NAGPRA Coordinator and Tribal Liaison in deciding whether to grant permission to access remains.

51.     When Professor Weiss made a written request asking to access the facility to research the Native American remains and take x-rays for future research, the NAGPRA Coordinator expressly denied Professor Weiss access to the facility. The NAGPRA Coordinator informed Professor Weiss that she will not be given access prior to repatriation—i.e., the removal of the remains from campus and the University's control—thus depriving her of any opportunity to ever study these remains again. This was confirmed at a January 25, 2022 faculty meeting.

52.     Upon information and belief, repatriation of the remains will occur during June 2022.

53.     53. This new policy is substantially disruptive to Professor Weiss's curational and research duties.

54.     Before the new policy, Professor Weiss was in the middle of an important curational project regarding the proper sorting of remains that had been disrupted by the COVID-19 pandemic. Completion of this project is vital to ensure that the University can properly comply with AB 275.

55.     SJSU's interim directive recognizes AB 275's requirement to take inventory of remains and objects subject to NAGPRA and CalNAGPRA. However, for the inventory process, the interim policy allows only appropriately trained and supervised student assistants to assist the NAGPRA Coordinator and Tribal Liaison in their management of the curation spaces. By specifying only students to assist the inventory process, failing to ask Professor Weiss to train and supervise these students

when she is the most qualified faculty member to do so, and denying her access to complete her curational sorting project or otherwise partake in the inventory process, the interim directive was announced and is being enforced with retaliatory motive.

56.     Other California universities' NAGPRA policies, such as at California State University at Long Beach, Sacramento State University, and the University of California system, do not allow only student assistants to aid NAGPRA Coordinators, Tribal Liaisons, or individuals occupying similar positions in the inventory process as SJSU's interim directive does, and such is not compelled by NAGPRA or CalNAGPRA. This further shows SJSU's retaliatory motive.

57.     The Native American collection at SJSU in general is a particularly valuable resource for research because the collection is especially large and well-preserved. Additionally, because prior studies have already established many details about the collection, such as the sex and age of each skeleton, Professor Weiss's research would not be slowed by having to engage in such preliminary analysis.

58.     Moreover, if Professor Weiss could access the Native American remains prior to their repatriation then she would be able to conduct valuable academic research, including at least two more studies that she had been planning to perform for some time.

59.     First, Professor Weiss intended to study whether certain changes to the skull result from environmental or biological causes. There has been a longstanding question among osteologists as to whether changes around the eye socket and sides of the skull are signs of anemia. Osteologists have struggled to answer this question because other variables such as growth, aging, or other health factors could account for these changes. Professor Weiss's research would attempt to control for these other variables.

60.     The Native American collection at SJSU is especially suited for this research because that collection has many skulls exhibiting the relevant indicators of anemia, and certain growth lines on the shin bones and other characteristics in the

collection would help rule out other variables that may explain the cranial abnormalities.

61.    Professor Weiss also planned to conduct research on the relationship between bone loss and bone growth. Individuals can gain bone through conditions such as osteoarthritis, while other conditions such as osteoporosis cause a skeleton to lose bone. Professor Weiss intended to research the open question of whether people who gain bone are less likely to subsequently lose bone. Studying this question would help researchers to better understand activity patterns through skeletal change, such as whether heel spurs indicate that a person walked a great deal or simply had a predisposition. The research would also help answer the question of whether humans have evolved to develop osteoarthritis, a non-fatal condition, as a means of combatting the dangers of osteoporosis, which can be a fatal condition. This research could have implications for medicine. Indeed, one of Professor Weiss's prior studies on bony spurs was published by a medical journal. Again, the size and well-preserved state of SJSU's Native American collection is  ideal for this research.

62.    The research plans described above all would have involved student volunteers, resulted in journal publications, and provided Professor Weiss with material for her next book. If she were granted access at some point between now and repatriation in the coming months, she could still make progress on these research projects and access or take x-rays that would allow her to continue some limited research following repatriation.

63.    Professor Weiss also wishes to access the facility to take photographs as part of the above research, for future books and articles she plans to write, and for an upcoming publication. Peer reviewers of an article that Professor Weiss has submitted for publication have asked for clearer photographs of skeletal remains. She had planned to fulfil this request once she returned to the facility following prolonged absence due to the pandemic, but she is now unable to take those photographs due to the directive.

64.     Even if Professor Weiss could access the curational facility prior to the collection's repatriation, the interim directive still bars her from taking the photographs that are an essential component of her intended research and future publications.  Other California universities do not similarly prohibit taking photographs and videos of remains for which access has been granted.

*Professor Weiss Was Denied Access to the Non-Native American Materials in the Collection for Over a Month, and then Was Allowed Access only Outside the Curational Facility in Poor Research Conditions*

65.     The Defendants have limited Professor Weiss's access to remains that are not protected by NAGPRA, CalNAGPRA, or AB 275. The new policy on its face applies to both Native American remains and materials that are not subject to NAGPRA protections. The curational facility, which Professor Weiss can no longer access without permission, includes a collection of non-Native remains known as the Carthage Collection. It also contains two large filing cabinets of x-rays relevant to Professor Weiss's work, which she likewise cannot access. The breadth of the University's directive, which extends far beyond limiting access to the Native American collection, further demonstrates its retaliatory motive.

66.     Other California universities' NAGPRA-related policies, such as at California State University at Long Beach, San Francisco State University, Sacramento State University, and the University of California system, distinguish between Native and non-Native remains, allowing research and teaching uses of remains not covered by NAGPRA under less strict requirements. The breadth of SJSU's interim directive further demonstrates its retaliatory nature.

67.     Shortly after the announcement of the new directive, Professor Weiss emailed Defendant Gonzalez requesting access to the facility so that she could do research on non-NAGPRA remains, including the Carthage collection, and assess what other materials that are not protected by NAGPRA could be utilized for research.

/ / /

68.     From October 6, 2021, to November 15, 2021, Professor Weiss was not allowed to access the Carthage collection. Defendant Gonzalez claimed that this prohibition of access to even the non-Native remains was necessary to allow the faculty to vote on new protocols.

69.     Professor Weiss's inability to access this collection for over a month directly affected her ability to perform necessary preliminary research that she would have otherwise conducted during that timeframe. If accessible, Professor Weiss would have begun assessing the quality, condition, and characteristics of the collection to determine how she might use the collection in future research, a task that is essential to any work she might be able to do with the remains.

70.     On November 15, 2021, Defendant Gonzalez finally allowed Professor Weiss to access the Carthage collection, but not in the curational facility. Instead, the remains were moved to two adjoining rooms outside the curational facility. These storage locations are inadequate in several respects, resulting in ongoing impairment of Professor Weiss's research.

71.     One of the rooms used to store the remains is a classroom in active use. The classroom is inaccessible to Professor Weiss for research purposes when classes are in session in that room. Next semester, the room will be in use for classes all day, Monday through Thursday, including at least some evenings.

72.     Further, the boxes are stored and organized in such a way as to impede research. Professor Weiss cannot go through them in a specific order or easily take out one box at a time. In late November 2021, Professor Weiss began going through the collection and found that the collection is so poorly organized that it took her over an hour to rebag and properly store the materials, which would have taken substantially less time if the collection had been stored in the curational facility. Delays due to disorganization will continue so long as the Carthage collection is not stored in a location suited to organizing and storing human remains, i.e., the University's curational facility.

73.    Even if she could adequately study the Carthage collection, the collection is not an adequate substitute for the Native American remains in performing Professor Weiss's planned research. The Carthage collection is much smaller than the Native American collection. Further, the Carthage skeletons are in much worse condition than the Native American skeletons. It is therefore impossible for Professor Weiss to use the Carthage collection to conduct her intended research with anything approaching the same quality and rigor as would be possible with the Native American collection.

*Denial of Access to X-Rays*

74.    Because of the interim directive and its enforcement against Professor Weiss, she also lacks access to x-rays taken of the existing Native American collection that—while only an imperfect substitute for actual remains—would facilitate her research for years to come. Such x-rays are not protected by NAGPRA, CalNAGPRA, or AB 275. But in light of Defendants' unwillingness to facilitate access Professor Weiss fears that they plan to destroy or repatriate these remains.

75.    Defendant Gonzalez has also stated that Professor Weiss's access to even the non-Native American x-rays is dependent on Defendants Sunseri and Ragland granting her access. Professor Weiss has been seeking access to these x-rays since the interim policy was announced, but Defendant Sunseri has told her that she cannot access the facility even for this limited purpose. There is no non-retaliatory reason that she should be denied access to these x-rays.

*Denial of Course Credit*

76.    In the past, Professor Weiss had also been able to receive teaching credit for her curational duties. If her responsibilities are eliminated or curtailed, she will be required to teach an additional class in the Spring and in subsequent semesters. She has been informed by Defendant Gonzalez that, at minimum, she will not be able to receive teaching credit for her curational duties next semester and perhaps longer.
/ / /

77.   If she is unable to obtain this teaching credit, then Professor Weiss will have to take on a greater course load, which will in turn limit the time that she can spend on curation, research, and writing.

*78.*   Additionally, Professor Weiss was praised extensively for her work as collections coordinator in her last post-tenure review and so the elimination of her responsibilities will likely harm her academic standing at her next review.

*Departmental Actions Against Professor Weiss and the Threat of Future Policies or Actions Targeting Her*

79.   On November 17, 2021, Defendant Gonzalez emailed the standing committee to put forward a statement on human remains which expressly denounces Professor Weiss for her tweet. The Statement declares that the department "strongly disapprove[s] of the post and do[es] not condone such practices" and apologizes because the tweet was "hurtful to many people." The statement recognized that the Department "lacked an explicit policy about the photographing of remains" but nevertheless falsely claims that Weiss violated a "generally accepted … standard of practice." The Statement also claims that there "are now stricter protocols regarding access to SJSU's Curational Facility—including a firm prohibition of video and photography of Native American remains."

80.   There is no generally accepted standard of practice that discourages the publication of photographs of professors holding or interacting with skeletal remains.

81.   At the time of Defendant Gonzalez's email, photographs of researchers holding skeletal remains were still visible on the SJSU anthropology department's website.

82.   On November 19, 2021, after a secret ballot vote, Defendant Gonzalez's statement was posted on the Department of Anthropology's website.

83.   Professor Weiss posted the following statement in dissent and asked Defendant Gonzalez to place it up on the website as well:

I Dissent

1

2

3

       I am the faculty member who posted a photo to Twitter while holding a skull. This photo was not different to many previous photos the university, college, and department used to promote anthropology. It is dishonest to portray this as an aberration of our departmental procedures.

4

5

       Photography in anthropology has been a valuable tool to ignite curiosity, display human variation respectfully, and teach about the past fruitfully. As the Asian proverb states: Better to see something once than to hear about it a thousand times.

6

7

8

9

10

       The statement includes the sentence: "All human remains should be treated with dignity and respect." Skeletal remains – both human and nonhuman – should be treated with respect. Respect's definition, from Merriam-Webster dictionary, is "a feeling of admiring someone or something that is good, valuable, important, etc." There is no evidence that I have done otherwise; I continuously show respect and dignity for skeletal remains because I know how much can be learned from them. Holding a skull and taking a photo is not about a lack of respect, but rather a demonstration that I hold these remains in high value, that I admire what we can learn from them, and that I know the serious science that can be deduced from their study.

11

12

13

       I have no reason to apologize. I have done nothing wrong. I will continue to fight for science over sensitivity, religion, and superstition. And, I am happy to work with anyone who values truth and objectivity. And, thus, regarding this Statement on Handling Human Remains I choose to quote Ruth Bader Ginsburg, "I dissent"!

14

15

16

17

18

84.    On information and belief, Defendant Gonzalez plans to put forward additional resolutions targeting Professor Weiss and to propose additional policies that would curtail Professor Weiss's research, such as a ban on taking and sharing photographs and a requirement that Professor Weiss seek departmental approval before conducting research on skeletal remains.

19

20

21

22

85.    On information and belief, Defendant Gonzalez plans to take further actions against Professor Weiss if she continues to teach her views on repatriation, including putting forward additional resolutions targeting her and enacting policies that limit her freedom in the classroom.

23

**LEGAL CLAIMS**

24

25

26

**FIRST CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to Freedom of Speech**
**Retaliation**
**(42 U.S.C. § 1983)**
**COUNT 1**

27

86.    Plaintiff repeats and realleges each of the allegations in the complaint.

28

/ / /

87. Because Professor Weiss has written critically about repatriation, NAGPRA, and CalNAGPRA, the University has taken action against her based on the content of her speech and her viewpoint, and Defendants continue to threaten to do so if she continues to express her views.

88. By punishing and threatening to punish Professor Weiss for expressing her views regarding the repatriation of Native American remains, Defendants have retaliated and are retaliating against Professor Weiss for exercising her First Amendment rights.

89. Professor Weiss's publications, articles, teaching, and tweets on the topic of repatriation of human remains, as well as her views on the propriety of taking pictures with these remains, are matters of public concern and protected by the First Amendment.

90. The University's adoption and enforcement of the interim directive restricting Professor Weiss's access to SJSU's collection of remains constitutes retaliation against Professor Weiss for her speech on these matters of public concern.

91. The timing of the University's actions and statements by University officials and others make clear that the University succumbed to pressure and adopted a policy and enforced it in a manner aimed at excluding her from access to the remains and from her curational responsibilities. No other California university adopted a policy concerning Native American repatriation in the same haphazard and rushed fashion, and the fact that other California universities have older NAGPRA policies cuts against the claim that a desire to comply with AB 275 alone prompted SJSU's interim directive.

92. But for Professor Weiss's speech the University would not have taken these actions.

93. Neither NAGPRA, CalNAGPRA, nor AB 275 require the University to remove Professor Weiss from her duties as custodian of SJSU's collection, to prohibit her from taking photographs of remains, or to bar her from access to the Native

American collections. AB 275 contemplates an orderly transition process which would allow Professor Weiss to complete her research and continue to carry out her curational duties.

94. Other universities in California have included anthropology professors like Professor Weiss on committees dealing with native American repatriation. For instance, California State University, Chico has a committee which includes two anthropology faculty as well as the Director of Tribal Relationships, various administrators, and other university personnel. Moreover, California State University at Long Beach's NAGPRA policy requires a similar committee to be composed of two probationary or tenured faculty members specializing in archaeology, biological anthropology, cultural anthropology, or a closely related specialization.

95. Sacramento State University allows its Archaeology Curation Facility's Collections Manager to participate in the inventory process, but SJSU has not allowed Professor Weiss, its Collections Coordinator, to do so.

96. Other California universities that have implemented NAGPRA policies have not expressly and blanketly prohibited taking photographs and videos of human remains for which access has been granted. Coming on the heels of the controversy surrounding Professor Weiss's tweet, the fact that SJSU has done shows its retaliatory motive against her.

97. The University has no other compelling justification for acting against Professor Weiss other than its disagreement with the viewpoints that Professor Weiss has expressed.

98. As such, this is unconstitutional retaliation prohibited by the First Amendment. *See Demers v. Austin*, 729 F.3d 1011 (9th Cir. 2013) (reiterating that the First Amendment continues to "apply to teaching and academic writing" in light of the "'expansive freedoms of speech and thought associated with the university.'" (quoting *Grutter v. Bollinger,* 539 U.S. 306, 329 (2003)); *See also Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957) ("To impose any strait jacket upon the

intellectual leaders in our colleges and universities would imperil the future of our Nation. . . . Scholarship cannot flourish in an atmosphere of suspicion and distrust. Teachers and students must always remain free to inquire, to study and to evaluate, to gain new maturity and understanding; otherwise our civilization will stagnate and die.").

99.    Professor Weiss has suffered irreparable harm as a result of this unconstitutional retaliation.

100.    By restricting her access to skeletal remains, prohibiting photography of those remains, stripping away access to the research facility, and threatening Professor Weiss for sharing photographs of her research, the University has substantially burdened Professor Weiss's ability to conduct her research, collaborate with her peers, and publish her findings.

101.    Defendants' retaliatory actions violate Professor Weiss's right to free speech as guaranteed by the First Amendment to the United States Constitution.

**SECOND CAUSE OF ACTION**
**Violation of Plaintiff's First Amendment Right to be Free from**
**Unconstitutional Conditions**
**(42 U.S.C. § 1983)**

102.    Plaintiff repeats and realleges each of the allegations in the complaint.

103.    By threatening to condition Professor Weiss's ability to teach students in the classroom (and ultimately her employment status at SJSU) on her willingness to surrender her constitutionally protected right to express her views on repatriation, Defendants have imposed or threatened to impose an unconstitutional condition on her in violation of her First Amendment rights.

104.    Defendants have refused to retract or disavow Defendant Gonzalez's threat conditioning Professor Weiss's continued ability to teach on her willingness to refrain from teaching students her views on repatriation.

105.    As a result of the threats from Defendant Gonzalez, which have never been retracted, and the continuing pressure being put on Defendant Jacobs and other

1   University officials, Professor Weiss has a credible fear that the University will
2   continue to take further retaliatory actions against her for her speech, including but
3   not limited to attempting to remove her from the classroom, take away her tenure,
4   and terminate her employment.

5       106.   Despite the continuing threat of retaliation and the resulting chilling
6   effect, Professor Weiss plans to continue to share her views about Native American
7   repatriation and the proper handling of human remains both in the media and with
8   her students.

9                          **RELIEF SOUGHT**

10      Wherefore, Plaintiff respectfully requests the Court to enter judgment against
11  Defendant as follows:

12      1.   Declaring that Defendants' actions constituted unlawful retaliation
13  against Plaintiff for her protected First Amendment activities

14      2.   Granting an injunction preliminarily, and thereafter, permanently
15  against Defendant and Defendant's officers, agents, affiliates, servants, successors,
16  employees, and other persons as follows:

17      a.   Enjoining Defendants from enforcing Interim Presidential Directive, PD-
18  2021-03, against Professor Weiss, including the restriction on access to the curation
19  facilities and the ban on photography of remains;

20      b.   Enjoining Defendants from engaging in any further retaliatory actions
21  against Professor Weiss in response to the exercise of her academic freedom such as
22  removing Professor Weiss from the classroom, altering her courses, or preventing her
23  from expressing her views on repatriation to students.

24      3.   Entering judgment for Plaintiff and against Defendants for the
25  deprivation of her rights;

26      4.   Awarding Plaintiff nominal damages for the violation of her rights;

27      5.   Awarding Plaintiff's costs and attorneys' fees under 42 U.S.C. § 1988;

28      Awarding such further relief as the Court deems just and proper.

1    DATED: January 31, 2022.

2                                          Respectfully submitted,

3                                          DANIEL M. ORTNER
                                           ETHAN W. BLEVINS
4                                          Pacific Legal Foundation

5                                          By _____ s/ Daniel M. Ortner _____
6                                                       DANIEL M. ORTNER

7                                          *Attorneys for Plaintiff*
                                           *Elizabeth Weiss*
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28