BRADLEY S. PHILLIPS (State Bar No. 85263)
brad.phillips@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

NATALIE G. MOYCE (State Bar No. 341326)
natalie.moyce@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone:     (415) 512-4000
Facsimile:     (415) 512-4077

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ELIZABETH WEISS, | Case No. 5:22-cv-00641-BLF |
| Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| vs. | Judge:  Hon. Beth Labson Freeman |
| STEPHEN PEREZ, in his official capacity as President of San Jose State University; *et al.*, | Date:   April 28, 2022<br>Time:   9:00 a.m.<br>Crtrm:  3, 5th Floor |
| Defendants. | |

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION.................................................................................................1

II.     ARGUMENT .....................................................................................................2

        A.      Rule 19 Requires Dismissal of this Case ...............................................2

                1.      CalNAGPRA Creates A Legally Protected Interest in Preventing
                        Mishandling and Disrespectful Treatment of Native American
                        Remains to Be Repatriated, Whether During Research or Otherwise ..........2

                2.      The Tribe Need Only Have and Has A Non-Frivolous Substantive
                        Legal Claim Concerning an Existing Right .................................................4

                3.      The University Cannot Adequately Represent the Tribe's Interests,
                        Nor Can NAHC or Individual Tribal Officials Be Joined in Order to
                        Do So.................................................................................................................5

                4.      The Requirement of Deference in CalNAGPRA Creates the
                        Potential for Inconsistent Legal Obligations ................................................6

                5.      The Tribe Is Immune from Suit......................................................................7

                6.      The Tribe Is Indispensable Because It Would Be Prejudiced By This
                        Court's Permitting Plaintiff to Research and Photograph the
                        Remains............................................................................................................8

                7.      The Adequacy or Inadequacy of Any Remedy Is Irrelevant........................8

                8.      The Public-Rights Exception Does Not Apply ..............................................9

        B.      Plaintiff Fails to State A Claim for Relief..............................................10

                1.      The Timing of the Directive's Adoption Correlates With Plaintiff's
                        Treatment of the Remains That the University Seeks to Prevent ...............11

                2.      Defendants Did Not Oppose Plaintiff's Speech ..........................................12

                3.      Other Universities' Policies and "Similar" Photographs Do Not
                        Plausibly Show the University's Proffered Motives Are Pretextual............14

                4.      Plaintiff's Fear of Retaliation is Purely Speculative ..................................15

III.    CONCLUSION ................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Am. Greyhound Racing, Inc. v. Hull*,
305 F.3d 1015 (9th Cir. 2002).....................................................................................9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .....................................................................................................11

*Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*,
928 F.2d 1496 (9th Cir. 1991).....................................................................................4

*Coszalter v. City of Salem*,
320 F.3d 968 (9th Cir. 2003)......................................................................................10

*Deschutes River All. v. Portland Gen. Elec. Co.*,
1 F.4th 1153 (9th Cir. 2021)........................................................................................8

*Dine Citizens Against Ruining Our Env't v. Bureau of Indian Affs.*,
932 F.3d 843 (9th Cir. 2019)........................................................................................8

*Dowell v. Contra Costa Cnty.*,
928 F. Supp. 2d 1137 (N.D. Cal. 2013) .....................................................................10

*Fair Pol. Pracs. Comm'n v. Agua Caliente Band of Cahuilla Indians*,
No. 02AS04545, 2003 WL 733094 (Cal. Super. Ct. Feb. 27, 2003) .......................7, 8

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999).......................................................................................13

*Jamul Action Comm. v. Simermeyer*,
974 F.3d 984 (9th Cir. 2020)......................................................................................4, 6

*Kescoli v. Babbitt*,
101 F.3d 1304 (9th Cir. 1996)....................................................................................9, 10

*Khoros, LLC v. Lenovo (United States), Inc.*,
No. 3:20-CV-03399-WHO, 2020 WL 12655516 (N.D. Cal. Oct. 5, 2020).............11

*Lazy Y Ranch Ltd. v. Behrens*,
546 F.3d 580 (9th Cir. 2008)......................................................................................11

*Makah Indian Tribe v. Verity*,
910 F.2d 555 (9th Cir. 1990).......................................................................................9

*Montclair Police Officers' Ass'n v. City of Montclair*,
No. CV126444PSGPLAX, 2012 WL 12888427 (C.D. Cal. Oct. 24, 2012).............10

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

*Republic of Philippines v. Pimentel*,
   553 U.S. 851 (2008) .................................................................................5

*Richter v. Ausmus*,
   No. 19-CV-08300-WHO, 2020 WL 1429758 (N.D. Cal. Mar. 24, 2020) ................................10

*Shermoen v. United States*,
   982 F.2d 1312 (9th Cir. 1992) .................................................................5

*Skidmore v. Gilbert*,
   No. 5:20-cv-06415-BLF (N.D. Cal. Feb. 15, 2022), ECF No. 83 ...............................13

*Trans Pac. Corp. v. S. Seas Enters. Ltd.*,
   291 F.2d 435 (9th Cir. 1961) ..................................................................9

*United States ex rel. Chunie v. Ringrose*,
   788 F.2d 638 (9th Cir. 1986) ..................................................................11

*United States v. O'Brien*,
   391 U.S. 367 (1968) ............................................................................12

*United States v. Swisher*,
   811 F.3d 299 (9th Cir. 2016) .................................................................12

*White v. Univ. of Cal.*,
   765 F.3d 1010 (9th Cir. 2014) ...................................................... 1, passim

**STATE STATUTES**

Cal. Health and Safety Code § 8011(a) ..........................................................1, 3

Cal. Health and Safety Code § 8011(b) ............................................................2

Cal. Health and Safety Code § 8012(g) ...........................................................15

Cal. Health and Safety Code § 8012(l) ...........................................................15

Cal. Health and Safety Code § 8013 ..............................................................3

Cal. Health and Safety Code § 8013(b)(1)(B)(i) ..................................................3

Cal. Health and Safety Code § 8013(c)(2) .................................................6, 8, 11

Cal. Health and Safety Code § 8013(g)(1) ........................................................2

Cal. Health and Safety Code § 8016(a) ...........................................................3

# **<u>TABLE OF AUTHORITIES</u>**

**Page(s)**

Cal. Health and Safety Code § 8016(a)(4) ...................................................................3, 4

Cal. Health and Safety Code § 8016(d) ......................................................................6, 7

Cal. Health and Safety Code § 8016(d)(2) ....................................................................7

Cal. Health and Safety Code § 8016(d)(4) ....................................................................7

Cal. Health and Safety Code § 8016(d)(7) ....................................................................7

Cal. Health and Safety Code § 8025 ..............................................................................3

Cal. Health and Safety Code § 8025(a)(2)(A) ...............................................................3

Cal. Health and Safety Code § 8029 ..............................................................................6

Cal. Health and Safety Code § 8029(d) .........................................................................7

**FEDERAL RULES**

Rule 12(b)(6) ..................................................................................................................1

Rule 12(b)(7) ..................................................................................................................1

Rule 19 ............................................................................................................... 2, passim

Rule 19(a) .......................................................................................................................5

**FEDERAL REGULATIONS**

43 C.F.R. § 10.10(c) .......................................................................................................3

43 C.F.R. § 10.10(c)(1) ...............................................................................................3, 4

**OTHER AUTHORITIES**

*X-ray, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/Xray
    (last visited Mar. 27, 2022) .....................................................................................15

# I.    INTRODUCTION

For two independent reasons, Plaintiff's claims must be dismissed. First, Plaintiff has not and cannot join to this suit the Muwekma Ohlone Tribe ("the Tribe"), which is an indispensable party with immunity. Plaintiff incorrectly contends that the Tribe has no legally protected interest to assert over the handling and treatment of the human remains to be repatriated to it, improperly assuming a decision for her on the merits that CalNAGPRA, which is to be liberally construed in favor of the Tribe, does not create such an interest or grant either the Tribe or the State any legal remedy in the event that Defendants fail to protect it. Plaintiff's contention is absurd: it would mean that, while SJSU was required, once the inventory and repatriation process began in January 2021, to defer to Tribes' recommendations about the handling and treatment of Native American human remains for purposes of taking an inventory, Plaintiff (or anyone else) was and is free to handle those remains in any way she chooses for purposes of "research." That contention, which is central to her argument against both Defendants' Rule 12(b)(6) and 12(b)(7) motions, is wrong.

Plaintiff further demeans the statutorily recognized interest of the Tribe in having the human remains "treated with dignity and respect," Cal. Health and Safety Code § 8011(a),—as *the Tribe* understands such treatment, not as Plaintiff self-servingly might—in suggesting that it would not be prejudiced by Plaintiff's completing her research on the remains and taking photos of them, against the Tribe's explicit demands. And Plaintiff repeatedly ignores binding Ninth Circuit case law, which holds that (1) SJSU is not an adequate representative of the Tribe's interests in human remains to be repatriated; (2) an interest in such remains triggers sovereign immunity; (3) a Tribe that is a necessary party is indispensable; and (4) a case such as this must be dismissed "regardless of whether a remedy is available, if the absent parties are Indian tribes invested with sovereign immunity." *White v. Univ. of Cal.*, 765 F.3d 1010, 1027-28 (9th Cir. 2014). Thus, the Tribe must, but cannot, be joined, and Plaintiff's claims must be dismissed.

In addition, Plaintiff fails to state a claim for First Amendment retaliation and unconstitutional conditions. Plaintiff has not plausibly alleged that her speech was a substantial or motivating factor behind the adoption of the Directive or that her future employment or teaching is conditioned upon limiting her speech. Plaintiff here relies again on her mistaken interpretation of

1    CalNAGPRA and otherwise mostly recites the allegations of her Complaint, ignoring the

2    documents authenticated by her that contradict those allegations. Plaintiff also makes another

3    absurd and incorrect contention: that, because she depicted her mishandling and disrespectful

4    treatment of the Native American skull in a tweet, which might be protected speech, SJSU was not

5    thereafter allowed to comply with CalNAGPRA by adopting a policy to prevent such conduct in

6    the future. Because this assertion is false and none of Plaintiff's allegations add up to a plausible

7    claim, Plaintiff's claims must be dismissed.

8    **II.    ARGUMENT**

9        **A.    Rule 19 Requires Dismissal of this Case**

10            1.    <u>CalNAGPRA Creates A Legally Protected Interest in Preventing</u>

11                   <u>Mishandling and Disrespectful Treatment of Native American Remains to Be Repatriated, Whether During Research or Otherwise</u>

12        Under CalNAGPRA, the Court is required to construe the law "*liberally in favor of the*

13    *Indians*, resolve all ambiguities in the law *in favor of the Indians*, and *preserve tribal property*

14    *rights and sovereignty* unless a contrary intent is clearly stated." Cal. Health and Safety Code §

15    8011(b) (emphasis added). Plaintiff's narrow interpretation of CalNAGPRA—that its detailed

16    requirements about consultation with and deference to the Tribes in the handling and treatment of

17    human remains after January 1, 2021, apply only to the "inventory" and "repatriation" processes,

18    leaving researchers such as Plaintiff free, *at the same time*, to do anything they like with the

19    remains for "research" purposes, regardless of whether the Tribes believe those actions are

20    disrespectful, undignified, and harmful—far from being "liberal," is a cramped and unreasonable

21    reading of the law. Under Plaintiff's interpretation, specific conduct would, in deference to the

22    Tribe, be prohibited on the part of those doing an "inventory," but precisely the same conduct

23    would be allowed, at the same time, for researchers. This is nonsense.

24        As Plaintiff concedes, CalNAGPRA expressly "does not authorize the initiation *or*

25    *completion* of any academic, museum, or scientific study of human remains." Cal. Health and

26    Safety Code § 8013(g)(1) (emphasis added). It is unclear what the purpose of this provision would

27    be, if not to make clear that research is *not* permitted if, per Section 8013's requirements of

28    consultation with and deference to the Tribes, the Tribes do not want such research to take place.

1   Moreover, even if research were permitted against the wishes of the Tribes, there is no

2   reason that the requirements to "minimiz[e] handling," "limit unnecessary handling and damage to

3   the items," and "defer to tribal recommendations for appropriate handling and treatment" in the

4   process of inventorying remains would not also apply to any research that is conducted during the

5   inventory process or after it is completed and before the remains are repatriated. Cal. Health and

6   Safety Code §§ 8013(b)(1)(B)(i); (c)(1), (2). There would be little purpose to handling remains

7   with dignity and respect during the inventory process if they could simply be mishandled as part

8   of "research" before being returned to the Tribes.

9   This conclusion is bolstered by the express intent of the California legislature to provide

10  for a "seamless and *consistent* state policy to ensure that all California Indian human remains and

11  cultural items be treated with dignity and respect." Cal. Health and Safety Code § 8011(a)

12  (emphasis added). In Section 8025, which governs (through funding conditions) the handling and

13  treatment of Native American human remains by the constitutionally created University of

14  California, "respectful and culturally appropriate treatment [of remains]" is expressly defined, not

15  to be separate from, but to "*includ[e]* policies regarding *research* requests and testing." *Id.* §

16  8025(a)(2)(A) (emphases added). There is no reason to think that "treatment" means one thing in

17  Section 8013 and another in Section 8025. Indeed, it would be nonsensical to hold that when UC

18  handles human remains for research purposes, it is held to a different standard than others such as

19  California State University.

20  Plaintiff cites California Health and Safety Code Section 8016(a)(4) for the proposition

21  that "scientific research will continue even after the inventory is completed." Opp. to MTD, ECF

22  No. 57, at 10 (citations to filing pagination). This is very misleading. Section 8016(a) governs the

23  criteria to determine whether and when remains shall be repatriated. In the sentence preceding the

24  one Plaintiff quotes (the only other sentence), Subsection (a)(4) states one of the conditions for

25  repatriation: "None of the exemptions listed in Section 10.10(c) of Title 43 of the [CFR] apply."

26  Subdivision (1) of that federal provision (the only one relevant here) provides that the

27  requirements for repatriation do not apply to "[c]ircumstances where human remains . . . are

28  indispensable to the completion of a *specific scientific study, the outcome of which is of major*

*benefit to the United States.*" 43 C.F.R. § 10.10(c)(1) (emphasis added). The second sentence of Section 8016(a)(4), which Plaintiff quotes—"[s]cientific research shall be concluded within a reasonable time period"—clearly applies only to research that may, as a matter of federal law, be conducted notwithstanding the other provisions of NAGPRA and CalNAGPRA, because it has been shown (presumably by the United States) to be "indispensable" to a study "of major benefit to the United States." 43 C.F.R. § 10.10(c)(1). That has no bearing whatsoever on this case, where Plaintiff's research has not been shown to be indispensable to such a study.

> 2.    <u>The Tribe Need Only Have and Has A Non-Frivolous Substantive Legal Claim Concerning an Existing Right</u>

The Muwekma Ohlone Tribe claims an existing, non-frivolous right to proper handling and treatment of the human remains and cultural artifacts to be repatriated to it by SJSU under CalNAGPRA, which would be impaired by a ruling in Plaintiff's favor that Plaintiff may handle and photograph the remains against the express wishes of the Tribe. Moreover, contrary to Plaintiff's implication, the prejudice to the Tribe would result from impairment of the same legal interest (in preventing mishandling of remains) as the legal interest that makes the Tribe a necessary party to this action. *See Confederated Tribes of Chehalis Indian Rsrv. v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) (holding there is no partial or compromise remedy that will not prejudice the Tribe under these circumstances).

In holding that the interest of the absent party cannot be "merely some stake in the outcome of the litigation," the court in *Jamul Action Committee v. Simermeyer* distinguished between claims seeking to protect retroactive rights, which do implicate Rule 19, and those relating only to future administrative process, which do not. 974 F.3d 984, 996-97 (9th Cir. 2020). A Tribe has an interest that is sufficient for purposes of Rule 19 when "the suit, if successful, would impair the Tribe's existing [rights]." *Id.* at 997. Here, the Tribe's existing rights to proper handling and treatment of the remains under CalNAGPRA would be impaired if Plaintiff is permitted to conduct research on and photograph them. It is not merely future compliance with administrative procedures by SJSU that is implicated.

Plaintiff argues that the Court should consider and reject the merits of the Tribe's claimed interest at this stage, but "that argument misses the point of the Rule 19(a) inquiry. The question is whether the Tribes . . . have a *claim* that is not 'patently frivolous.'" *White*, 765 F.3d at 1027 (quoting *Shermoen v. United States*, 982 F.2d 1312, 1318 (9th Cir. 1992)). To rule at this stage that the Tribe's claimed interest in the handling of the remains is not a legally protected one would be to litigate the ultimate *merits* of the CalNAGPRA issue, rather than assess whether the Tribes have a non-frivolous claim to dignified and respectful treatment of the remains, which is all that is required. *See id.* ("the language of the rule contemplates that a party need *only* have a 'claim' to an interest." (emphasis added)). Plaintiff relies on *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), to suggest that a preliminary assessment of the merits is required, but that Supreme Court decision itself squarely supports the holding of *White* that a legally protected interest need only be non-frivolous: the Court held that "it was improper to issue a definitive holding regarding a *nonfrivolous*, substantive claim made by an absent, required entity that was entitled by its sovereign status to immunity from suit." *Republic of Phil.*, 553 U.S. at 868-69 (emphasis added).

3. The University Cannot Adequately Represent the Tribe's Interests, Nor Can NAHC or Individual Tribal Officials Be Joined in Order to Do So

As the Ninth Circuit held in *White*, the fact that the University's interests may be aligned with the Tribe's at present does not mean it can adequately represent the Tribe's interests in a suit pertaining to remains to be repatriated to the Tribe. *White*, 765 F.3d at 1027. As Defendants explain in their motion to dismiss, the University's "broad obligation to serve the interests of the people of California . . . could lead to a later divergence of interests" that make the University a poor surrogate for representing the Tribe in this suit. *Id.* Plaintiff ignores the Ninth Circuit's decision in *White*, which is on all fours with this case. Defendants have satisfied what Plaintiff concedes is a "minimal" burden to establish inadequate representation. Opp. to MTD at 13.

Plaintiff casts around for another substitute, suggesting that "the Commissioner or other officers of the California Native Heritage Commission, or officers of the Muwekma Ohlone Tribe . . . could be sued in their official capacities" to represent the Tribe's interests. Opp. to MTD at 13. Of course, the same could have been true in *White*. Indeed, if it were true, as Plaintiff alleges, that

to name tribal officials in this suit would cure the Rule 19 defect, then all the Ninth Circuit cases dismissed for failure to name a Tribe were wrongly decided – the plaintiffs in those cases could simply have named tribal officials in the Tribes' stead. In any event, neither individual officers of the NAHC nor tribal officials could properly be named under *Ex Parte Young*, as the Ninth Circuit's decision in *Jamul* itself makes clear, because Plaintiff has no claim against any such official for unlawful conduct that she seeks to enjoin. *Jamul Action Comm.*, 974 F.3d at 994 ("For *Ex Parte Young* to apply, a plaintiff must point to threatened or ongoing unlawful conduct by a particular governmental officer."). That is the only circumstance where *Young* may be used to avoid the effect of immunity with respect to suits against a sovereign entity. As in *Jamul*, Plaintiff "fails to articulate any connection between the particular named tribal officers [or NAHC officials] and any allegedly unlawful conduct." *Id.* at 995. "The doctrine does not allow a plaintiff to circumvent sovereign immunity by naming some arbitrarily chosen [] officer[.]" *Id.* at 994.

4.    <u>The Requirement of Deference in CalNAGPRA Creates the Potential for Inconsistent Legal Obligations</u>

Plaintiff asserts that SJSU need only "consult" with the Tribe about inventory protocols. But that entirely ignores that SJSU "shall defer" to the Tribe's recommendations with regard to appropriate handling and treatment under CalNAGPRA. Cal. Health and Safety Code § 8013(c)(2). CalNAGPRA's requirement of deference appears to give the NAHC and/or the Tribe a legal claim in the event that SJSU chose to ignore the Tribe's recommendations. At the very least, it raises the possibility of (1) a competing demand by the State, including the NAHC; (2) civil penalties under Section 8029; and/or (3) a demand for dispute resolution followed by a possible Superior Court action by the Tribe under Section 8016(d).

California Health and Safety Code Section 8029 contemplates civil penalties for failure to comply with CalNAGPRA. In its letter that Plaintiff references in her Opposition, the NAHC soberly demanded that the University comply with "state law requirements for handling California Indian remains and cultural items," that it "not [allow] its California Indian collections to be used for further research and teaching" without express permission from the affiliated Tribe, and that it "attend the Commission's public meeting . . . to provide an update on what steps SJSU is taking to

1    fulfill its obligations under CalNAGPRA." Opp. to MTD at 13, 24, citing Del Casino Decl. Ex. H.

2    The implication of this letter is that allowing the collections to be used for research without

3    permission from the affiliated Tribe—as the University would have to do were Plaintiff's

4    requested relief granted—would result in some form of penalty by NAHC on the University.

5    While SJSU would be immune from civil penalties for good-faith compliance with *NAGPRA*,

6    there is no comparable provision for non-compliance with *Cal*NAGPRA, where the requirements

7    concerning deference as to the handling and treatment of remains appear. *See* Cal. Health and

8    Safety Code § 8029(d).

9         Section 8016(d) of the Health and Safety Code covers "dispute[s] between the requesting

10   party and the agency" as well as "dispute[s] aris[ing] in relation to the repatriation process." If

11   Plaintiff's requested relief were granted, a mediation process could be triggered under this section

12   involving the University, the Tribe, and NAHC. *Id.* § 8016(d)(2). Either a mediator or the NAHC

13   could (and presumably would) ultimately conclude that the Tribe is entitled to deference as to the

14   handling and treatment of the remains, and the University would thereby be subject to inconsistent

15   legal obligations imposed by the NAHC and this Court, or even between this Court and a state

16   court on statutorily permitted, independent review of the NAHC's decision. *Id.* § 8016(d)(4), (7).

17                    5.    The Tribe Is Immune from Suit

18        Plaintiff's sovereign immunity argument again ignores *White*, where the Ninth Circuit held

19   that a Tribe's interest in human remains triggered its sovereign immunity even in the face of First

20   Amendment claims by University of California anthropology professors. *White*, 765 F.3d at 1026-

21   28. Indeed, Plaintiff asks the Court to hold that the Tribe has no sovereign immunity by resolving

22   the First Amendment merits issue in Plaintiff's favor, which it may not do in the Rule 19 context.

23        Among the "activities affecting the governance and development of another sovereign"

24   that do not trigger sovereign immunity for Native American Tribes are those "intended to

25   influence a sovereign State's electoral and legislative processes," which means Tribes are not

26   immune from "a suit by the State to enforce its laws regulating all persons who seek to influence

27   the State's political processes." *Fair Pol. Pracs. Comm'n v. Agua Caliente Band of Cahuilla*

28   *Indians*, No. 02AS04545, 2003 WL 733094, at *5 (Cal. Super. Ct. Feb. 27, 2003). Obviously,

1  Plaintiff is not the State enforcing its laws against the Tribe, and the Tribe's influence, granted to

2  it by law, over a single policy at SJSU that limits access to human remains shortly to become the

3  Tribe's property, is in no way comparable to the "campaign contributions and legislative lobbying

4  activities" at the State level that are contemplated by this limit to tribal immunity. *Fair Pol. Pracs.*

5  *Comm'n*, No. 02AS04545, 2003 WL 733094, at \*8. The limited deference provided for by

6  CalNAGPRA hardly amounts to "unreviewable control over the management of a state's

7  personnel and property," as Plaintiff asserts. Opp. to MTD at 14.

8         6.   <u>The Tribe Is Indispensable Because It Would Be Prejudiced By This</u>

              <u>Court's Permitting Plaintiff to Research and Photograph the Remains</u>

9

10       Plaintiff cites not a single case in which a Tribe with sovereign immunity was held to be a

11  necessary party but then held not to be indispensable. There is, in fact, a "wall" of Ninth Circuit

12  authority mandating dismissal in this situation. *Dine Citizens Against Ruining Our Env't v. Bureau*

13  *of Indian Affs.*, 932 F.3d 843, 857 (9th Cir. 2019) (quoting *White*, 765 F.3d at 1028). *Accord*:

14  *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1163 (9th Cir. 2021).

15       Instead, Plaintiff asserts that, in her opinion, the Tribe will not be prejudiced by allowing

16  her to complete her research before the remains are repatriated. Opp. to MTD at 15-16. That self-

17  serving assertion belittles the Tribe's interest in respectful and dignified treatment of its ancestors'

18  human remains and discounts the Tribe's interpretation that such treatment excludes research and

19  photography. To the Tribe, permitting Plaintiff to engage in those activities is not a "narrow

20  remedy," *id.*, at all. Although Plaintiff may not agree with the Tribe's interpretation, it is not up to

21  Plaintiff to decide: the Legislature has determined that the Tribe is entitled to deference as to the

22  handling and treatment of the remains. Cal. Health and Safety Code § 8013(c)(2).

23         7.   <u>The Adequacy or Inadequacy of Any Remedy Is Irrelevant</u>

24       Plaintiff claims that, because there is no need for an injunction against the Tribe in this

25  case in order for Plaintiff to get relief, the Tribe is not indispensable. But Plaintiff cannot

26  distinguish this case from *White*, where no injunction was sought or needed against the Tribes

27  because UC San Diego had possession of the remains; and where the plaintiffs, like Plaintiff here,

28  claimed that their First Amendment rights would be violated in the absence of an injunction.

1    Under these circumstances, the Ninth Circuit still held that the Tribes were indispensable. *See*

2    *generally White*, 765 F.3d 1010.

3          Thus, it would be "inconsistent with equity and good conscience" to allow this suit to

4    proceed without the Tribe. *Trans Pac. Corp. v. S. Seas Enters. Ltd.*, 291 F.2d 435, 436 (9th Cir.

5    1961). Plaintiff's contention that *preventing* this suit from proceeding would be inconsistent with

6    equity and good conscience improperly reverses that test. Opp. to MTD at 15. Plaintiff's argument

7    that the case should not be dismissed because she will then lack an adequate remedy is disposed of

8    by the Ninth Circuit's holding that a case must be dismissed under Rule 19 "regardless of whether

9    a remedy is available, if the absent parties are Indian tribes invested with sovereign immunity."

10   *White*, 765 F.3d at 1028.

11              8.        The Public-Rights Exception Does Not Apply

12         The public-rights exception to Rule 19 is reserved for cases that "transcend the private

13   interests of the litigants and seek to vindicate a public right," such as "establishing for all the

14   principle of separation of powers." *Am. Greyhound Racing, Inc. v. Hull*, 305 F.3d 1015, 1026 (9th

15   Cir. 2002) (quoting *Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir. 1996)). This case addresses

16   the research interests of a single professor. Plaintiff's claims are "private one[s] focused on the

17   merits of her dispute rather than on vindicating a larger public interest." *Kescoli*, 101 F.3d at 1311.

18   Though Plaintiff characterizes her claim as involving a public interest in "academic freedom

19   without fear of retaliation," Opp. to MTD at 17, what she truly seeks is access to the remains to be

20   repatriated to the Tribes in order to complete research that she claims is of great value to her

21   personally. This is directly analogous to *White*, where the professor plaintiffs sought, based on the

22   First Amendment, to do research on Native American remains, and the Ninth Circuit held that the

23   public-rights exception did not apply. *White*, 765 F.3d at 1028.

24         To be eligible for the public-rights exception, a suit must "seek relief that would affect

25   only the future conduct of the administrative process," such as "enforc[ing] the duty of" an agency

26   "to follow statutory procedures in the future." *Makah Indian Tribe v. Verity*, 910 F.2d 555, 559 &

27   n.6 (9th Cir. 1990). Plaintiff's suit, conversely, is backward-looking: she seeks to undo a decision

28   that the University has already made in adopting the Directive. And prejudice to the Tribes of

1    granting Plaintiff access to the remains without joining them, when the Tribes have explicitly

2    defined who may handle them to her exclusion, is certain. The public-rights exception is not

3    available in this situation. *See Kescoli*, 101 F.3d at 1312 ("Contrary to *Makah*, the present

4    litigation is not limited to ensuring an agency's future compliance with statutory procedures and is

5    not one in which the risk of prejudice to the [Tribes] is nonexistent or minimal.").

6            **B.      Plaintiff Fails to State A Claim for Relief**

7            Plaintiff has failed to state a claim for First Amendment retaliation, and she confuses the

8    relevant legal tests in attempting to make the case that she has. Plaintiff must plausibly allege three

9    factors to avoid dismissal: "(1) that he or she engaged in protected speech; (2) that the employer

10   took 'adverse employment action'; *and* (3) that his or her speech was a 'substantial or motivating'

11   factor for the adverse employment action." *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.

12   2003) (emphasis added) (citation omitted). It is not correct that "dismissal under 12(b)(6) is

13   improper so long as plaintiffs 'have met their burden as to establishing that the speech in question

14   is protected based on the pleadings,'" as Plaintiff asserts. Opp. to MTD at 19 (quoting *Montclair*

15   *Police Officers' Ass'n v. City of Montclair*, No. CV126444PSGPLAX, 2012 WL 12888427, at *7

16   (C.D. Cal. Oct. 24, 2012)). This language in *Montclair* explains when a policy should not be

17   dismissed as facially invalid for overbreadth, an issue that is entirely irrelevant here. Plaintiff also

18   mischaracterizes *Coszalter*, citing it for the broad proposition that the question of Defendants'

19   motivation "is a factual one, improper to resolve at the 12(b)(6) stage." Opp. to MTD at 21. But

20   courts *do* assess whether First Amendment retaliation claims plausibly allege that the protected

21   speech was a motivating factor at the 12(b)(6) stage, even though "whether an adverse

22   employment action is intended to be retaliatory is a question of fact[.]" *Coszalter*, 320 F.3d at 978.

23   *See, e.g.*, *Dowell v. Contra Costa Cnty.*, 928 F. Supp. 2d 1137, 1150-51 (N.D. Cal. 2013); *Richter*

24   *v. Ausmus*, No. 19-CV-08300-WHO, 2020 WL 1429758, at *8 (N.D. Cal. Mar. 24, 2020).

25           As to the evidentiary issues that Plaintiff raises, Defendants do not, as Plaintiff asserts

26   (Opp. to MTD at 21), ask the Court to consider the testimony contained in Plaintiff's *declaration*

27   in connection with their motion to dismiss. Rather, Defendants ask only that the Court consider the

28   *documents* that are relied upon in the Complaint and that are *authenticated* by either Plaintiff's or

her counsel's declaration. Pointing to the plain content of these documents in order to demonstrate the falsity or implausibility of Plaintiff's factual allegations is permitted at the 12(b)(6) stage. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) ("we need not accept as true allegations contradicting documents that are referenced in the complaint"); *Khoros, LLC v. Lenovo (United States), Inc.*, No. 3:20-CV-03399-WHO, 2020 WL 12655516, at *10 (N.D. Cal. Oct. 5, 2020) ("It is entirely possible for exhibits to show that allegations are not plausible."). Thus, Defendants' reliance on the content of the photographs on the Anthropology Department's website, other universities' policies, and transcript of Professor Gonzalez's remarks, all of which are authenticated by Plaintiff's declarations, is not improper. The Court also "need not assume the truth of legal conclusions cast in the form of factual allegations," *United States ex rel. Chunie v. Ringrose*, 788 F.2d 638, 643 n.2 (9th Cir. 1986), such as Plaintiff's conclusion that her handling of the remains was "not inconsistent with either NAGPRA or CalNAGPRA." Compl. ¶ 34.

   1.   <u>The Timing of the Directive's Adoption Correlates With Plaintiff's Treatment of the Remains That the University Seeks to Prevent</u>

   The Complaint and attached documents show that Defendants did not take action against Plaintiff based on her expressions of her viewpoint about repatriation, about which they had known "for years without controversy" and which earned her commendations from Professor Gonzalez as well as a teaching award. Compl. ¶ 21. The Directive was adopted only after the University became aware that Plaintiff was handling human remains in a disrespectful and undignified manner, contrary to the wishes of the Tribes, to whom the University "*shall defer . . . for appropriate handling and treatment*" under CalNAGPRA. Cal. Health and Safety Code § 8013(c)(2) (emphasis added). This "obvious alternative explanation" for the Directive's adoption renders implausible Plaintiff's allegation that its proximity in time to her expression of viewpoints about repatriation and the ensuing controversy indicates that her speech was a substantial or motivating factor in its adoption. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) (citation omitted).

   Plaintiff, recognizing this, attempts to argue that the Directive was adopted in retaliation for, not her viewpoint about repatriation, but the "expressive conduct" depicted in the tweet. Opp. to MTD at 21. But this argument proves far too much. If Plaintiff had photographed herself

1    breaking apart the skull in order to protest CalNAGPRA, surely Defendants would not then have

2    been prohibited from adopting a policy against destroying human remains on the theory that it was

3    "retaliation" for Plaintiff's "expressive conduct." Plaintiff cannot defeat otherwise lawful policies

4    protecting human remains by mishandling them for "expressive" purposes.

5           Even if Plaintiff's handling of the skull could be considered expressive conduct, the

6    Directive permissibly regulates that conduct. The four-factor test established by the Supreme

7    Court in *United States v. O'Brien*, 391 U.S. 367, 377 (1968), applies when, as here, a policy is

8    aimed at "the conduct itself, rather than at the message conveyed by that conduct[.]" *United States*

9    *v. Swisher*, 811 F.3d 299, 312 (9th Cir. 2016). The Directive is aimed on its face at the handling of

10   Native American remains, not at limiting any message Plaintiff was trying to convey in doing so.

11   The Directive easily satisfies the *O'Brien* factors: restricting the handling of remains and artifacts

12   in the University's possession falls within the University's power; the Directive furthers the

13   University's important and substantial interests in preserving the remains until they are repatriated

14   as required under CalNAGPRA; that interest is unrelated to the suppression of free expression,

15   because the Directive regulates the handling of human remains by all at the University, whether or

16   not it is done expressively; and "the incidental restriction on alleged First Amendment freedoms is

17   no greater than is essential to the furtherance of that interest" – Plaintiff may continue to tweet and

18   publish whatever opinions she likes, so long as she does not handle remains that are to be

19   repatriated in violation of the Directive and CalNAGPRA. *O'Brien*, 391 U.S. at 377.

20                      2.    Defendants Did Not Oppose Plaintiff's Speech

21          The Complaint and related documents do not plausibly show that Defendants opposed

22   Plaintiff's right to express her viewpoint—to the contrary, Plaintiff's allegations and evidence

23   show they *defended* it. Compl. ¶¶ 23, 33; Weiss Decl. Ex. 5 at 10, 15; Ex. 6 at 3; Ex. 11 at 4.

24          Professor Gonzalez's statements made during the June 2021 webinar do not create a

25   plausible inference that Plaintiff's speech was a substantial or motivating factor behind the

26   adoption of the Directive. Plaintiff does not even allege that Gonzalez participated in the adoption

27   of the Directive, or that his actions "set in motion the chain of events" leading to its adoption. *See*

28

1   *Gilbrook v. City of Westminster*, 177 F.3d 839, 854 (9th Cir. 1999). Thus, even if Gonzalez had

2   opposed her speech, it would not suggest anything as to the motives behind the Directive.

3          In any event, Gonzalez's remarks at the webinar had nothing to do with the provisions of

4   the Directive about which Plaintiff complains. Defendants do not ask the Court to "side with

5   Defendants' reading of what transpired," Opp. to MTD at 23, but do ask that the Court consider

6   Professor Gonzalez's comments in their undisputed context. Gonzalez agreed with a colleague

7   that, if Plaintiff held "white-supremacist values" and "expos[ed] students *to that* in the classroom"

8   (not to Plaintiff's views on repatriation expressed in her book), *that* would "cause an ethical

9   barrier." Weiss Decl. Ex. 5, 40:17-23 (emphasis added). Gonzalez also did not "brainstorm" that

10  *he* might "limit[] '[Plaintiff's] capacity to do things or demand resources from the department or

11  anybody else.'" Opp. to MTD at 23. He said, "she's really isolated herself in a way," and "what

12  it's meant is that she's really limited in her capacity to do things or demand resources from the

13  department or anybody else. Because we operate things pretty democratically in our department

14  and that's been our tradition. That's our departmental culture." Weiss Decl. Ex. 5, 34:1, 34:9-14.

15         These statements do not represent opposition to Plaintiff's ability to express herself. To the

16  contrary, all university professors, including Professor Gonzalez and others at SJSU, have a right

17  to express their opinions and "respond to the statements they deem[] objectionable" without fear

18  of being sued for doing so. Order, *Skidmore v. Gilbert*, No. 5:20-cv-06415-BLF, at *13 (N.D. Cal.

19  Feb. 15, 2022), ECF No. 83. In *Skidmore*, in which a student made incendiary remarks on social

20  media, this Court held that there was no clearly established right violated by a defendant professor

21  who responded by suggesting the "use [of] a conduct hearing process to 'discipline someone [who

22  is] spreading hate and fear within our community.'" *Id.* at *6. No clearly established right was

23  violated by the defendants' statements even though they allegedly led to death threats, harassment,

24  hate mail, cancellation of interviews and appearances, loss of career opportunities, changes in the

25  membership of plaintiff's graduate committee because of bias, and concerns being raised about the

26  quality of plaintiff's research. *Id.* at *6-7. Although Plaintiff, not having sought damages, does not

27  have to show that a clearly established right has been violated, *Skidmore* illustrates that Plaintiff

28  does not have the right to "stifle comments made in direct reaction to her [speech]." *Id.* at *21.

3. <u>Other Universities' Policies and "Similar" Photographs Do Not Plausibly Show the University's Proffered Motives Are Pretextual</u>

The Complaint and related documents establish that the Directive was adopted in order to comply with CalNAGPRA by deferring to the recommendations of Tribes with respect to handling and treatment of human remains. Indeed, even if Plaintiff had not published a photo of herself mishandling the remains (thereby eliminating any expressive element), the University would still have been compelled by the Tribes to adopt the same provisions in its Directive, had they learned of her conduct some other way. There is nothing in CalNAGPRA that requires the University to examine and evaluate the motivations behind the Tribes' recommendations about dignified and respectful treatment of their ancestors' human remains—only a requirement that the University defer to those recommendations. The University's compliance with this requirement does not permit the Tribes to "manage[] . . . [the] state's personnel and property" or to "enshrine tribal religious traditions into law," as Plaintiff claims. Opp. to MTD at 14, 17. To the extent the Tribes have requested any action be taken against Plaintiff beyond the adoption of a university-wide policy on handling and treatment of remains, Defendants have refused.

A brief review of the allegedly "similar" photographs and other universities' policies attached to Plaintiff's declaration quickly debunks Plaintiff's theory that these establish the University's true motivations as pretextual. The photographs pre-date enactment of AB 275 and do not picture anyone other than Plaintiff holding a real human skull. Weiss Decl. Ex. 10. Other universities' policies either were adopted well before AB 275 or are undated, with the exception of the University of California's policy, which was issued *after* SJSU's. *See* Ortner Decl. Exs. 27; 28; 34; 35. Most importantly, these policies are not less restrictive than SJSU's. While they do not expressly prohibit access, photography, and X-rays, they *do* altogether prohibit access *without the Tribes' consent*. *See* Ortner Decl. Exs. 27; 28; 34 at 45. At SJSU, the Tribes have disapproved access to the remains outside of what has been defined in the Directive. *See* Weiss Decl. Ex. 14.

Plaintiff's allegation that the provisions of AB 275 regarding "handling and treatment" do not apply to X-rays because they are not "cultural items" is a legal conclusion that need not be taken as true. Opp. to MTD at 24. In fact, the definition of "cultural items" cited by Plaintiff at

§ 8012(g) is explicitly "subject to the definition of reasonable, as defined in subdivision (l)," which states that "[t]ribal traditional knowledge can and should be used to establish reasonable conclusions with respect to . . . *identifying cultural items*." Cal. Health and Safety Code § 8012(l) (emphasis added). It is undisputed that the Tribes have requested that photography not be allowed. An X-ray is defined as "a photograph obtained by use of X-rays." *X-ray, Merriam-Webster.com*, https://www.merriam-webster.com/dictionary/Xray (last visited Mar. 27, 2022). Given that, and given that the statute is to be liberally construed in favor of the Tribes and their traditional knowledge, and that X-rays are among the cultural items to be repatriated to the Tribes, SJSU is justified in restricting Plaintiff's access to X-rays in deference to the Tribes.

### 4. Plaintiff's Fear of Retaliation is Purely Speculative

Plaintiff's speculation and self-serving allegation that she "construed" Gonzalez's statements as threats of future retaliation, Opp. to MTD at 25, are insufficient to support a claim that an injunction is needed to prevent retaliatory action or unconstitutional conditions from being imposed on her employment or ability to teach at SJSU. Plaintiff makes much of an email exchange between Gonzalez and Ragland, but that exchange does not show them "conspiring" against Plaintiff. *Id.* To the contrary, Gonzalez stated that he "personally support[ed] [Plaintiff's] proposed research activities" and made efforts to determine who could approve them. Sunseri Decl. ISO Opposition to PI, Ex. K. Ragland merely expressed her "professional opinion," to which she is entitled, that Plaintiff's "blatant disregard for the respect of the dead" should limit Plaintiff's future access to human remains. *Id.* Though Plaintiff may disagree with Ragland's conclusion, Ragland has taken no adverse action against Plaintiff, and she is not alleged to (and does not) have any power to do so.

## III.  CONCLUSION

For the foregoing reasons and those set forth in the Motion to Dismiss, Plaintiff's Complaint should be dismissed with prejudice.

DATED:  March 28, 2022

By:  */s/ Bradley S. Phillips*
Bradley S. Phillips
MUNGER, TOLLES & OLSON LLP
Attorneys for Defendants