United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| ELIZABETH WEISS,<br><br>                    Plaintiff,<br><br>          v.<br><br>STEPHEN PEREZ, et al.,<br><br>                    Defendants. | Case No.  22-cv-00641-BLF<br><br>**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND IN PART; DENYING MOTION FOR PRELIMINARY INJUNCTION**<br><br>[Re:  ECF No. 8, 31] |

In this case, Elizabeth Weiss, a tenured professor of physical anthropology at San Jose State University, alleges that the University enacted Interim Presidential Directive PD 2021-03, which restricted access to and use of Native American remains housed at the University.  The University claims the provisions in the Directive are required by recently amended state law and enacted as part of a process to prepare for repatriation of remains to a local Native American tribe, but Professor Weiss asserts that the policy was in fact promulgated in retaliation for her speech expressing opposition to repatriation of Native American remains.  Professor Weiss brings two claims under 42 U.S.C. § 1983 for violation of her First Amendment rights and seeks an injunction barring the University from enforcing the Directive against her or retaliating against her for her views on repatriation.

Now before the Court are two motions:  Professor Weiss's motion for a preliminary injunction (ECF No. 8) and Defendants' motion to dismiss (ECF No. 31).  The Court held a hearing on these motions on April 28, 2022.  ECF No. 73.  The Court finds that the Muwekma Ohlone Tribe is a required party under Rule 19 to adjudication of Professor Weiss's claims about the Directive.  Because the Tribe has sovereign immunity from suit and thus cannot be joined, Professor Weiss's claims regarding the Directive must be dismissed with prejudice.  The Court

will, however, give Professor Weiss leave to amend her complaint as to her allegations about retaliation in the form of restricting access to and use of non-Native American remains and retaliation for her protected speech as it may pertain to her teaching and curational responsibilities. Accordingly, Defendants' motion to dismiss is GRANTED WITH LEAVE TO AMEND IN PART and Professor Weiss's motion for a preliminary injunction is DENIED.

## I.    BACKGROUND

### A.    Professor Weiss and Her Controversial Views on Repatriation

Professor Elizabeth Weiss is a tenured professor of physical anthropology at San Jose State University where she specializes in osteology, the study of human skeletal remains.  ECF No. 1 ("Compl.") ¶ 15.  Since 2004, she has served as the University's Collections Coordinator who is in charge of establishing protocols for and facilitating research on the University's collection of skeletal remains.  *Id.* ¶¶ 16–17.  The University's collection includes Native American remains, cultural items, and x-rays of these remains.  Compl. ¶ 18.  This includes remains of ancestors of the Muwekma Ohlone Tribe, which comprises "all of the known surviving American Indian lineages aboriginal to the San Francisco Bay region who trace their ancestry through the Missions Santa Clara, San Jose, and San Francisco."  *See* Compl. ¶¶ 18, 43–45; ECF No. 31-9 ("Wilcox Rpt.") at 10.

Both federal and state law impose restrictions on the treatment of Native American remains.  Congress passed the Native American Graves Protection and Repatriation Act ("NAGPRA") in 1990.  *See* 25 U.S.C. §§ 3001–3013.  California has passed its own state legislation—the California Native American Graves Protection and Repatriation Act.  *See* Cal. Health & Safety Code §§ 8011–8030 ("CalNAGPRA").  Both sets of statutes restrict the use and handling of Native American remains and cultural items and establish a process through which Native American tribes can file requests for the return of remains or cultural items through what is known as "repatriation."  Professor Weiss alleges that she has "always complied strictly with NAGPRA and [CalNAGPRA]" and has ensured that researchers have communicated with members of the relevant Tribes to "ensure culturally appropriate research."  Compl. ¶ 18.

Professor Weiss is a critic of repatriation.  Compl. ¶ 19.  In 2020, she published a book

United States District Court
Northern District of California

United States District Court
Northern District of California

entitled "Repatriation and Erasing the Past," which criticizes NAGPRA, CalNAGPRA, and similar state laws that require universities and museums to return Native American remains to tribal descendants. *Id.* Professor Weiss believes that these laws "undermine objective scientific inquiry and violate the Establishment Clause of the United States Constitution by favoring religion over science." *Id.* The book generated controversy among academics and on social media. *Id.* ¶ 20. About a thousand professors and graduate students signed an open letter calling the book "anti-indigenous" and "racist." *Id.*

Professor Weiss alleges that she has made these arguments about repatriation for several years without controversy at the University. Compl. ¶ 21. A few years prior, she was "commended" by Defendant Roberto Gonzalez, Chair of the Univeristy's Anthropology Department, for her ability to "spark lively discussions among various stakeholders" and to "boost the department's national reputation as a center that fosters creative and unorthodox viewpoints on important issues." *Id.* The University gave her the Austin D. Warburton Award of Merit in 2019. *Id.*

In the wake of the publication of her book, however, Professor Weiss alleges that she faced "an escalating series of threats and retaliatory actions." Compl. ¶ 22. In June 2021, Defendant Walt Jacobs, Dean of the College of Social Sciences and the University, hosted a Zoom webinar entitled "What to Do When a Tenured Professor is Branded a Racist." *Id.* ¶ 23. At the Zoom event, Professor Weiss alleges she was "repeatedly branded . . . a white supremacist" for her views on repatriation. *Id.* ¶ 24. Defendant Gonzalez allegedly implied at the Zoom event that he would take adverse action against her if she was not tenured, suggested that she was "professionally incompetent," and agreed that it would be "unethical" to allow her to teach her views to students. *Id.* ¶ 25. Gonzalez said he would try to prevent Professor Weiss from teaching her viewpoint in the classroom, but that he "could not do anything about her employment status until her tenure review came up several years down the road." *Id.* ¶ 26. Professor Weiss has always taught and plans to teach her views (as well as contrary views) on repatriation in her classes. *Id.* ¶ 27. After the Zoom event, Professor Weiss requested a letter from Gonzalez and Jacobs assuring her that she would be allowed to assign her book, speak about her research in class, and access skeletal

1    remains for research purposes.  *Id.* ¶ 28.  Jacobs told her that Defendant Vincent Del Casino, the

2    Provost of the University, and the Office of Faculty Affairs would not let him provide her a letter.

3    *Id.*  Jacobs further said that Gonzalez would not retract his statements and that Jacobs was

4    receiving pressure from others to take action against her.  *Id.*  Counsel for Professor Weiss then

5    sent a letter to Del Casino, Jacobs, and Gonzalez warning of potential legal action.  *Id.* ¶ 29.

6           On August 31, 2021, Professor Weiss published an op-ed in The Mercury News and The

7    East Bay Times outlining her critique of AB 275, which had amended CalNAGPRA.  Compl.

8    ¶ 31.  After the op-ed was published, the University received "multiple vitriolic emails" from

9    academics and the public demanding discipline against Professor Weiss.  *Id.*

10          On September 18, 2021, Professor Weiss posted a tweet to her Twitter account.  Compl.

11   ¶ 32; *see also* ECF No. 17 ("Weiss Decl.") Ex. 9 (screenshot of tweet).  The tweet stated, "So

12   happy to be back with some old friends @SJSU #anthrotwitter #archaeotwitter".  Weiss Decl. Ex.

13   9.  Attached to the tweet was a photo of Professor Weiss smiling and holding without gloves a

14   Native American skull from the University's collection.  Compl. ¶ 32; Weiss Decl. Ex. 9.

15   Professor Weiss alleges that she and other "renowned anthropologists and journalists have

16   frequently posted similar images of scientists holding skeletal remains without controversy," and

17   that the Anthropology Department had several similar photographs posted on its website at the

18   time of the tweet.  Compl. ¶ 32.

19          The tweet ignited a firestorm of controversy.  Eleven days later, Del Casino published an

20   open letter declaring that the tweet "ha[d] evoked shock and disgust from our Native and

21   Indigenous community on campus and from many people within and outside of [the University]."

22   Compl. ¶ 33.  Del Casino stated that the image was contrary to social science ethics and "laws

23   such as AB 275."  *Id.*  Professor Weiss sent an email in response explaining that her handling of

24   remains was consistent with University practice and NAGPRA and CalNAGPRA.  *Id.* ¶ 34.  The

25   same day, Professor Kimberly Robertson of California State University, Long Beach, a member of

26   the Muscogee (Creek) Nation, wrote a letter to the Native American Heritage Commission

27   ("NAHC")—the body that oversees repatriation of Native American remains—demanding that the

28   University remove Professor Weiss from her teaching post and bar her from further interaction

1   with Native American remains.  *Id.* ¶ 35.

2       On November 30, 2021, a University professor circulated a letter entitled "Statement of

3   Support with the Muwekma Ohlone Tribe for Respectful Return of Ancestors at San Jose State

4   University and in the CSU."  Compl. ¶¶ 42–44.  The letter was written by the California State

5   University East Bay Indigenous Acknowledgment Collective, an organization of tribal members,

6   students, and faculty in the CSU system.  *Id.* ¶ 43.  The letter calls Professor Weiss's actions

7   "prime examples of colonial violence against the [Tribe]."  *Id.* ¶ 45.  The letter asserts support for

8   "the barring of [Professor] Weiss from access to the remains as well as to related archaeological

9   materials for the duration of the return of ancestors from SJSU."  *Id.*

10      **B.    The Directive and Its Effects on Professor Weiss**

11      On October 6, 2021, the University announced Interim Presidential Directive PD-2021-03,

12  entitled "San Jose State University's Interim Protocol for Curation Spaces in Alignment with

13  NAGPRA, CalNAGPRA, AB275" (the "Directive").  Compl. ¶¶ 36–37; *see also* Weiss Decl. Ex.

14  14.  The Directive has four provisions governing the University's "curated collections of human

15  remains, artifacts, and funerary objections" (the "Collections"):

16  - The curation spaces at SJSU that house the Collections will be
17    exclusively managed by the SJSU NAGPRA Coordinator and the
      SJSU Tribal Liaison, supplemented by student assistants who are
      appropriately trained and supervised to assist with the inventory
18    process.

19  - The Collections will continue to remain in a locked, secure area on
      campus, and all access will be overseen by the SJSU NAGPRA
20    Coordinator and the SJSU Tribal Liaison.

21  - Any physical access to or use of the Collections, including for
      research or teaching, will require written approval of the NAGPRA
22    Coordinator and Tribal Liaison.

23  - Audio, video, or photographic devices are prohibited in the curation
      spaces, as is taking photo images or videos of human remains,
24    funerary objects, or the boxes in which these materials are held.

25  Compl. ¶ 37; Weiss Decl. Ex. 14.  Professor Weiss alleges that the Directive, while defended as a

26  facially neutral protocol implementing legal duties, was enacted to retaliate against her for her

27  views on repatriation and is not required by NAGPRA or CalNAGPRA.  Compl. ¶¶ 36, 38.

28  Professor Weiss alleges that she is the University's only physical anthropologist and only faculty

United States District Court
Northern District of California

member who regularly accesses skeletal remains for research. *Id.* ¶ 39.  The University admits

that the Directive was a "direct result . . . of consultation that [it] had with the affected [T]ribe"

and the NAHC. *Id.* ¶ 40.  Professor Weiss alleges that other California universities' NAGPRA-

related policies are not so strict. *Id.* ¶¶ 56, 66.

The Directive has affected Professor Weiss in several ways.  First, since the Directive was

announced, Professor Weiss has been locked out of the curational facility that houses all skeletal

remains. Compl. ¶ 49.  Professor Weiss made a written request, pursuant to the Directive, for

access to the facility to research and take x-rays, but Defendant Charlotte Sunseri (the NAGPRA

Coordinator) denied the request. *Id.* ¶ 51.  Sunseri informed Professor Weiss that she would not

be given access prior to the repatriation of the remains to the Tribe, depriving her of any

opportunity to study the remains.[1] *Id.*  This has prevented Professor Weiss from conducting

academic research, including two studies that she had been intending to conduct prior to the

repatriation. *Id.* ¶¶ 58–64.  Professor Weiss is also barred from accessing x-rays that were already

taken of the remains in the collection. *Id.* ¶¶ 74–75.

Second, it cut her out of her contractually assigned leadership duties over the University's

collection of human remains. Compl. ¶ 48.  Part of these duties included a curational project

regarding the proper sorting of remains that was disrupted by COVID-19 and which Professor

Weiss says is critical to compliance with AB 275. *Id.* ¶ 54.  Because these curational duties have

been eliminated or limited, Professor Weiss says she may not receive teaching credit for those

duties, which would force her to take on a greater teaching load and may affect her academic

standing at her next tenure review. *Id.* ¶¶ 76–78.

Third, Professor Weiss was for a time denied access to non-Native American remains that

are not covered by NAGPRA or CalNAGPRA, including the Carthage Collection. Compl. ¶ 65,

67.  Gonzalez denied Professor Weiss's request to access the Carthage Collection from the time

the Directive was enacted until November 15, 2021. *Id.* ¶¶ 68–69.  When she was finally allowed

access to the Carthage Collection, she was not permitted to access it in the curational facility. *Id.*

---

[1] Professor Weiss alleges on information and belief that repatriation will occur in June 2022.
Compl. ¶ 52.

¶ 70.  Instead, the Carthage Collection was moved to two adjoining rooms outside the curational facility.  *Id.*  Professor Weiss says these locations are inferior—one is a classroom in active use, and the boxes in which the remains are stored are poorly organized.  *Id.* ¶¶ 70–72.  The Carthage Collection itself, in any case, is an inadequate substitute for the University's collection of Native American remains because it is much smaller and in worse condition.  *Id.* ¶ 73.

Finally, Professor Weiss alleges that the Directive indicates that the University and the Anthropology Department plan future retaliatory actions against her.  On November 17, 2021, Gonzalez emailed the Department's standing committee to offer a statement on human remains that denounces Professor Weiss's tweet.  Compl. ¶ 79.  The statement was posted on the Department's website, along with a dissenting statement from Professor Weiss.  *Id.* ¶¶ 82–83.  Professor Weiss alleges that Gonzalez plans to put forward additional resolutions targeting her and curtailing her teaching and research.  *Id.* ¶¶ 84–85.

### C.    This Lawsuit

On January 31, 2022, Professor Weiss filed this lawsuit against Stephen Perez (the Interim President of the University), Alisha Marie Ragland (the Tribal Liaison), Del Casino, Jacobs, Gonzalez, and Sunseri.  *See* Compl.  Professor Weiss brings two claims under 42 U.S.C. § 1983—the first for retaliation in violation of her First Amendment Right to Freedom of Speech, *see id.* ¶¶ 86–101; and the second for violation of her First Amendment Right to be Free from Unconstitutional Conditions, *id.* ¶¶ 102–106.  Professor Weiss seeks injunctive relief and declaratory relief, nominal damages, and costs and attorneys' fees.  *Id.* at Prayer for Relief.

Professor Weiss immediately filed a motion for a preliminary injunction.  *See* ECF No. 8. She seeks an injunction with the following terms:

- Defendants are enjoined from enforcing Interim Presidential Directive, PD-2021-03 to restrict Professor Weiss's access to the curation facilities to conduct research and ban her photography of remains.

- . . . Defendants are barred from engaging in any further retaliatory actions against Professor Weiss in response to the exercise of her academic freedom such as removing Professor Weiss from the classroom, altering her courses, or preventing her from expressing her views on repatriation to students.

United States District Court
Northern District of California

1    ECF No. 12.  On February 24, 2022, Defendants filed a motion to dismiss.  *See* ECF No. 31.

2    ## II.   MOTION TO DISMISS

3            Defendants' motion to dismiss raises two separate arguments.  See ECF No. 31 ("MTD");

4    *see also* ECF Nos. 57 ("Opp."), 60 ("Reply").  First, Defendants argue that Professor Weiss's

5    Complaint must be dismissed with prejudice under Rule 12(b)(7) for failure to join a required

6    party.  MTD at 7–16.  Second, Defendants argue that Professor Weiss fails to state a claim under

7    Rule 12(b)(6) as she currently pleads her complaint.  *Id.* at 16–25.  Because these arguments have

8    separate legal frameworks (including different rules regarding consideration of material outside

9    the pleadings), the Court considers the arguments separately.

10           ### A.   Rule 12(b)(7) – Failure to Join a Required Party

11           A party may move under Federal Rule of Civil Procedure 12(b)(7) to dismiss a claim for

12   "failure to join a party under Rule 19."  Federal Rule of Civil Procedure 19 governs the joinder of

13   "required parties."  Courts engage in a three-step process to determine whether claims must be

14   dismissed due to the absence of a required party.  First, the Court must determine if the party is a

15   "necessary" party under Rule 19(a).[2] *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d

16   1176, 1178–79 (9th Cir. 2012).  Second, if so, the Court must decide whether it is feasible to order

17   joinder of the necessary party.  *Id.*  Finally, if joinder is not feasible, the Court must evaluate if the

18   absent party is "indispensable" under Rule 19(b), or whether "in equity and in good conscience"

19   the claims can proceed without the party.  *Id.*  "In order to determine whether Rule 19 requires the

20   joinder of additional parties, the court may consider evidence outside the pleadings."  *Hammons v.*

21   *Wells Fargo Bank, N.A.*, 2015 WL 9258092, at *7 (N.D. Cal. Dec. 18, 2015).

22           Defendants argue that Professor Weiss's Complaint must be dismissed with prejudice

23   because of the absence of a required party—the Muwekma Ohlone Tribe.  Defendants argue that

24   the Tribe is a "necessary" party under Rule 19(a) because the Tribe's ability to protect its interest

25   in the remains of the ancestors of its members would be impaired if this lawsuit proceeds without

26

27   [2] Rule 19 used the terms "necessary" and "indispensable" prior to amendments in 2007.  These
     changes were "stylistic only," so pre-2007 precedents still apply.  *Republic of Phil. v. Pimentel*,
28   553 U.S. 851, 855 (2008).  The Court uses the terms "necessary" and "indispensable" in light of
     those precedents.

it, and the University can't represent its interests and may face inconsistent obligations if the suit is adjudicated.  MTD at 8–12.  Defendants say that the Tribe has sovereign immunity and thus can't be joined.  *Id.* at 12–13.  Finally, Defendants say the Tribe is indispensable under a "wall of circuit authority" dismissing actions where a party cannot be joined due to sovereign immunity. *Id.* at 14–16.  Professor Weiss challenges Defendants' showing on each of the prongs of the Rule 19 analysis.  Opp. at 2–13.  The Court considers each part of the analysis in turn.

### i. Rule 19(a) – "Necessary Party"

A party is required—or under the traditional terminology, "necessary"—if that party "claims an interest relating to the subject of the action" and adjudicating the action in that party's absence would either "(i) as a practical matter impair or impede the person's ability to protect the interest, or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P. 19(a)(1)(B).  The Court agrees with Defendants that the Tribe satisfies both Rules 19(a)(1)(B)(i) and 19(a)(1)(B)(ii).

#### a. Rule 19(a)(1)(B)(i) – Impaired Ability to Protect Interest

Pursuant to Rule 19(a)(1)(B)(i), an absent party must be joined if they "claim an interest relating to the subject of the action" and proceeding in the party's absence would "as a practical matter impair or impede the person's ability to protect the interest."  An absent party has a "claim" to an interest within Rule 19(a) if the claim is legal in nature and not "patently frivolous."  *White v. Univ. of Cal.*, 765 F.3d 1010, 1027 (9th Cir. 2014); *see also Shermoen v. United States*, 982 F.3d 1312, 1317–18 (9th Cir. 1992) ("Just adjudication of claims requires that courts protect a party's right to be heard and to participate in adjudication of a claimed interest, even if the dispute is ultimately resolved to the detriment of that party.").

##### 1. "Claim [to] an Interest Relating to the Subject of the Action" That Would Be "Impair[ed] or Imped[ed]"

The Court agrees with Defendants that the Tribe has a "claim [to] an interest relating to the subject of [this] action" that would be impaired or impeded by adjudication in the Tribe's absence. At the center of Professor Weiss's Complaint are her allegations that the Directive went beyond the requirements of CalNAGPRA, as amended by AB 275, and NAGPRA.  *See, e.g.*, Compl. ¶ 38

1  (University had "no legal duty to implement the [D]irective"), 66 (Directive goes beyond policies

2  at other universities, "further demonstrat[ing] its retaliatory nature"), 93 (statutes did not require

3  University to remove Professor Weiss from custodial duties over Native American remains).

4  Professor Weiss urges the Court to conclude that the Tribe's interest under CalNAGPRA is

5  limited to the inventory and repatriation process and does not extend at all to "minimizing

6  handling" in the context of scientific research.  Opp. at 4–6 (citing, *inter alia*, Cal. Health &

7  Safety Code §§ 8013(a), (b)(1)–(2), (c)(1)–(2), 8016(a), (d), 8018.  And in her preliminary

8  injunction motion, Professor Weiss argues extensively that she is likely to prevail on the merits of

9  her case because NAGPRA and CalNAGPRA "do not compel [the] [D]irective."  ECF No. 16 at

10  15–16; *see also id.* at 17–19 (arguing that "at most [CalNAGPRA] requires the University to

11  simply consult with tribes and defer to them on how to 'minimize[] handling' while preparing the

12  remains for repatriation").

13      Defendants strenuously disagree with Professor Weiss's reading of what CalNAGPRA

14  requires.  Defendants argue that the Court is required to construe CalNAGPRA "liberally in favor

15  of the Indians, resolve all ambiguities in the law in favor of the Indians, and preserve tribal

16  property rights and sovereignty unless a contrary intent is clearly stated."  Reply at 2 (quoting Cal.

17  Health & Safety Code § 8011(b)).  Defendants say that Professor Weiss's interpretation of the

18  law—that consultation with and deference to the Tribes in the handling of remains is required for

19  inventory and repatriation but not research—is a "cramped and unreasonable" reading of the law.

20  *Id.*  Instead, Defendants contend, the law requires the same deference in the context of research,

21  which itself is specifically limited by CalNAGPRA in other ways as well.  *Id.* at 2–3.

22      The Court need not—and should not—resolve who engages in the better statutory

23  interpretation.  What is clear from the dispute is that there is a significant and bona fide dispute

24  over what is required by CalNAGPRA and whether the Directive goes beyond those requirements.

25  If the Court were to decide that Professor Weiss was correct about the scope of CalNAGPRA, the

26  Court would extinguish the Tribe's right in arguing for their (presumably contrary) interpretation

27  of the statute.  All that the Court need decide at this juncture is that the Tribe has an interest in part

28  of the subject of this lawsuit—the proper interpretation and scope of NAGPRA and

CalNAGPRA—that is not "patently frivolous" and would be impeded if the Court were to proceed with adjudicating this lawsuit. *See White*, 765 F.3d at 1027 (tribe's interest would be impeded in suit seeking to determine whether remains were "Native American" within meaning of NAGPRA because if the scientists prevailed in their claim that the remains were not "Native American," the tribe's claims would "be extinguished without the opportunity for them to be heard"). The interest is specific and concrete because it affects the handling of the human remains of ancestors of members of the Tribe.

Professor Weiss's arguments otherwise do not hold up to scrutiny. First, Professor Weiss makes several arguments against Defendants' (and presumably the Tribe's) interpretation of CalNAGPRA. *See* Opp. at 3–4 (urging a "preliminary assessment of the merits" of the claimed interest), 4–5 (presenting the arguments discussed above regarding the statutory interpretation of CalNAGPRA). But as the Court has already found, the Tribe holds a "claim" to a legal interest in this lawsuit—the proper interpretation of CalNAGPRA—that is not "patently frivolous." To the extent Professor Weiss urges the Court to take a "preliminary assessment" of the statutory construction that opposes her own, the Court has already done so and had concluded that it is not "patently frivolous" such that the "claim" can be disregarded under a Rule 19 analysis. *See Pimentel*, 553 U.S. at 868–69 ("improper to issue a definitive holding regarding a nonfrivolous, substantive claim made by an absent, required entity that was entitled by its sovereign status to immunity from suit").

Second, Professor Weiss attempts to distinguish the interest the tribes held in *White*, a Ninth Circuit case affirming dismissal of a NAGPRA complaint on Rule 19 grounds, from the interest of the Tribe here, but the Court finds the case quite similar to the case at bar. In *White*, the court considered a dispute over the classification of remains as "Native American" under the terms of NAGPRA. A field excavation project at the residence of the Chancellor of the University of California, San Diego unearthed two human skeletons which were estimated to be between 8977 and 9603 years old, making them among the earliest known human remains in North or South America. *White*, 765 F.3d at 1015. The land on which the remains were discovered was "aboriginally occupied by members of the Kumeyaay Nation" consisting of a number of federally

11

recognized tribes. *Id.* The lawsuit involved the custody of the remains. The Kumeyaay Nation requested, pursuant to NAGPRA, that the remains be repatriated to one of its member tribes. *Id.* at 1018. After a lengthy administrative process and changes in the regulatory landscape, the UC president authorized disposition of the remains to the tribe, concluding that they were "Native American" within the meaning of NAGPRA, despite significant dissention within the administrative process. *Id.* at 1019–21 (describing the dissention and varying viewpoints). Professors within the UC system filed a complaint, alleging in part a violation of their First Amendment rights when they requested and were denied an opportunity to study the remains prior to the repatriation. *Id.* at 1021–22.

After finding that the plaintiffs had Article III standing and that NAGPRA did not abrogate the tribes' sovereign immunity, *White*, 765 F.3d at 1022–26, the Ninth Circuit affirmed the district court's dismissal of the Complaint on Rule 19 grounds. First, the court found there was "no doubt" that the tribes had a legally protected interest under Rule 19. Their claim to the remains was "at the heart of the dispute" because the Tribes had "made formal claims" to the remains through the required administrative process. *Id.* at 1027. This interest would "unquestionably" be impaired or impeded if the suit proceeded without the tribes because if the plaintiffs prevailed and stopped the repatriation of remains to the tribes, the tribes' claims would "be extinguished without the opportunity for them to be heard." *Id.*

Professor Weiss argues that the Tribe's interest here is *de minimus* because she "does not challenge the legality of CalNAGPRA or the validity of the Tribe's interest in repatriation," or seek to delay any repatriation, as was the case in *White*. Opp. at 4–5. But Professor Weiss reads *White* far too narrowly. It is true that Professor Weiss does not seek in her complaint to stop or delay the repatriation. But *White* stands for the proposition that NAGPRA vests in tribes legally protected interests that would be impaired in such a way that proceeding in their absence would violate Rule 19. Just as the tribes in *White* had a non-frivolous claim in the subject matter of the lawsuit, the Tribe has one here. The Tribe has an interest in the proper interpretation of CalNAGPRA, which arguably requires the University to consult with and defer to the Tribe regarding the handling and treatment of human remains in inventory, research, and repatriation.

This interest would "unquestionably" be impaired if the Court proceeded with claims regarding whether the Directive exceeded those requirements because the Tribe's right to argue for that interpretation would "be extinguished without the opportunity for them to be heard." *Id.* at 1027. *White* thus leads to the Court's conclusion in this case.

Third and finally, Professor Weiss cites to *Cachil Dehe Band of Wintun Indians of the Colusa Indian Cmty. v. California* to argue that the Tribe's interest here is not sufficiently "substantial" because interests like "[m]ere concern over 'compliance with administrative procedures' cannot suffice." 547 F.3d 962, 971 (9th Cir. 2008). Opp. at 3, 4. But that case is distinguishable. In *Cahcil Dehe Band*, the Ninth Circuit found that tribes had no "legally protected" interest in a lawsuit concerning the interpretation of a gaming compact because the outcome of the litigation would only "have some financial consequences for the non-party tribes" due to the issuance of more gaming licenses. *Id.* at 971–72. Preservation of the absent tribes' market share in the gaming industry was not a sufficient "legally protected interest," the Court held. *Id.* at 972. This case is different. The Tribes' interest here is much more than an abstract interest in "compliance with administrative procedures" or an attenuated economic interest. The Tribe's "legally protected interest" is in the consultation and deference to which the Tribe argues it is entitled in the context of inventory, repatriation, *and* research under CalNAGPRA. The interest in the proper interpretation of CalNAGPRA is not abstract or a mere interest in compliance with the law, but has concrete consequences for the handling of the human remains of ancestors of members of the Tribe. *Cachil Dehe Band* is thus distinguishable.

## 2.  Adequacy of Existing Representation

In some cases, the Ninth Circuit has held that even where an absent party's interest is threatened, the case may proceed without joinder if an existing party adequately represents the absent party's interest. *White*, 765 F.3d at 1027. A present alignment of interests is insufficient to find adequate representation. *Id.* ("[T]he different motivations of the two parties could lead to a later divergence of interests.").

The Court finds that, contrary to Professor Weiss's argument otherwise, *White* is on-point here and leads to the conclusion that representation of the Tribe is not adequate. Professor Weiss

says that the University has a "complete alignment of interests" and that Defendants have

"concluded that they will defer to [T]ribal interests in every respect." Opp. at 7. Any "potential

future conflict" is inadequate, she says. *Id.* at 7–8. But these arguments were rejected in *White*,

where the interests were aligned "at present" but could diverge in the future. The university in

*White* had a broader obligation to "serve the interests of the people of California," rather than a

"subset of those people" such as the absent tribes. *White*, 765 F.3d at 1027. That is certainly the

case here as well. If this case were to proceed without the Tribe, the University's interests could

diverge from the Tribe's at a later stage of the litigation. The Tribe will have the distinct interest

in ensuring a particular form of handling and use of the human remains, while the University's

interest would be solely in complying with the Court's hypothetical ruling regarding the handling

of the remains (even if that diverges from the Tribe's preferred methods). These "different

motivations of the two parties could lead to a later divergence of interest," *id.*, so the Tribe is not

adequately represented by the current Defendants.

Professor Weiss also posits that other parties could be joined to adequately represent the

Tribe's interests, such as "the Commissioner or other officers of the California Native American

Heritage Commission, or officers of the Muwekma Ohlone Tribe who could be sued in their

official capacities." Opp. at 8. This is incorrect for two reasons. First, if Tribal officers could be

sued in their official capacities or the NAHC could be joined as a party to adequately represent a

Tribe, then "all the Ninth Circuit cases dismissed for failure to name a [t]ribe were wrongly

decided" because those parties could have been joined in those cases. Reply at 6. And second,

permitting joinder in that fashion would "allow a plaintiff to circumvent sovereign immunity by

naming some arbitrarily chosen . . . officer" with only "general responsibility" for tribal action.

*Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 994 (9th Cir. 2020). Because Professor Weiss

cannot point to "threatened or ongoing unlawful conduct by a *particular* [Tribal] officer," *id.* at

994 (citing *Ex parte Young*, 290 U.S. 123, 157 (1908)) (emphasis added), she cannot avoid the

consequences of the Tribe's sovereign immunity in this way.

Because the Tribe claims a non-frivolous interest in the outcome of claims about the

Directive that would be impeded if this case proceeds and no existing parties can represent the

14

1    Tribe, the Tribe is a "required"—or in the traditional terminology, "necessary"—party under Rule

2    19(a)(1)(B)(i) to those claims.

3                    *b.   Rule 19(a)(1)(B)(ii) – Inconsistent Obligations for Defendants*

4            Although the Tribe's claim of an interest in this lawsuit that would be impaired if the case

5    went forward is sufficient to make it a required party, the Court also finds that the Tribe is a

6    required party under Rule 19(a)(1)(B)(ii) because that claim of an interest would "leave an

7    existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent

8    obligations because of the interest." Fed. R. Civ. P. 19(a)(1)(B)(ii).  The Court agrees that the

9    situation posited by Defendants in their opening brief presents that very risk. *See* MTD at 12.  If

10   this Court were to adjudicate claims involving the Directive and enjoin its enforcement against

11   Professor Weiss, the Tribe (as a non-party) could still file a lawsuit against the University seeking

12   a declaration that the failure to enforce the Directive violated NAGPRA or CalNAGPRA's

13   requirements that the University "defer to tribal recommendations" regarding handling of human

14   remains and cultural items. *See id.*  The risk goes beyond legal action by the Tribe itself.  The

15   NAHC has demanded the University's compliance with CalNAGPRA and by implication

16   threatened civil penalties for non-compliance. *See* Cal. Health & Safety Code § 8029 (civil

17   penalties provision).  If a dispute arose "in relation to the repatriation process" as a result of non-

18   enforcement of the Directive, then CalNAGPRA further contemplates a mediation process

19   involving the University, the Tribe, and the NAHC. *Id.* § 8016(d)(2).

20           The confluence of these provisions leads to an inevitable conclusion:  if the Court

21   proceeded with adjudicating claims about the Directive, the University could find itself in the

22   unenviable position of "inconsistent obligations" in the form of (1) an injunction or other order

23   from this Court, and (2) either (i) a lawsuit from the Tribe or (ii) enforcement action or civil

24   penalties under CalNAGPRA.  Rule 19(a)(1)(B)(ii) exists to avoid this very situation of putting

25   Defendants between a rock and a hard place.  This is thus an independent reason supporting the

26   conclusion that the Tribe is a required party here to claims regarding the Directive.

27                            *       *       *

28           The Court concludes that the Tribe is a required party under Rule 19(a) to claims regarding

United States District Court
Northern District of California

1   the Directive.

2           ii.      **Feasibility of Joinder of the Tribe**

3           Having concluded that the Tribe is a required party under Rule 19(a), the Court next

4   considers whether the Tribe can be joined to this lawsuit.  *Salt River Project*, 672 F.3d at 1178–79.

5   The answer is clearly no.  "Suits against Indian tribes are . . . barred by sovereign immunity absent

6   a clear waiver by the tribe or congressional abrogation."  *Deschutes River All. v. Portland GE*, 1

7   F.4th 1153, 1159 (9th Cir. 2021) (quoting *Okla. Tax Comm'n v. Citizen Band Potawatomi Indian*

8   *Tribe of Okla.*, 498 U.S. 505, 509 (1991)).  NAGPRA did not abrogate tribal sovereign immunity.

9   *White*, 765 F.3d at 1023.  Because the Tribe is a Native American tribe[3] entitled to sovereign

10  immunity, it cannot be joined to his lawsuit.  *See, e.g.*, *Jamul Action Comm.*, 974 F.3d at 998

11  (because Native American village entitled to sovereign immunity, "joinder in [that] action [was]

12  therefore infeasible").

13          Professor Weiss's only response is that tribal sovereign immunity is limited to "activities

14  affecting tribal self-governance and economic development, not activities affecting the

15  government and development of another sovereign."  *See* Opp. at 9 (quoting *Fair Political*

16  *Practices Comm'n v. Agua Caliente Band of Cahuilla Indians*, 2003 WL 733094, at *4 (Cal.

17  Super. Ct. Feb. 27, 2003)).  Granting immunity here would "improperly give tribes unreviewable

18  control over the management of a state's personnel and property and undermine civil rights," she

19  says.  *Id.*  This argument runs headlong into *White*, in which the Ninth Circuit held that university

20  professors' First Amendment claims in a case involving NAGPRA could not proceed in the face

21  of tribal sovereign immunity.  *White*, 765 F.3d at 1023.  Professor Weiss's unpublished state court

22  case is inapplicable here because this case does not involve "a suit by [a state] to enforce its laws

23

24  ---

[3] Defendants argue that the Tribe is entitled to sovereign immunity notwithstanding that the Tribe
25  is not presently federally recognized.  *See* MTD at 12–13 (citing *Native Village of Tyonek v.*
    *Puckett*, 957 F.2d 631, 635 (9th Cir. 1992) (Indian community entitled to sovereign immunity if it
26  is federally recognized or it is "a body of Indians of the same or a similar race, united in a
    community under one leadership or government, and inhabiting a particular though sometime ill-
27  defined territory," and the "modern-day successor[]" to a "historical sovereign entity that
    exercised at least the minimal functions of a governing body")); *see also* Wilcox Rpt. (expert
28  report from Professor Michael Wilcox explaining why Tribe qualifies).  Professor Weiss does not
    contest that the Tribe qualifies under this test, so the Court need not analyze the point.

1   regulating all persons who seek to influence [a state's] political processes," which may not

2   implicate a tribe's sovereign immunity. *See Fair Political Practices Comm'n*, 2003 WL 733094,

3   at *8 (state court case involving "campaign contributions and legislative lobbying activities"

4   outside of scope of sovereign immunity).

5        The Tribe thus cannot feasibly be joined to this case due to its sovereign immunity.

6        **iii.**     **Rule 19(b) – "Indispensable Party"**

7        The final part of the Rule 19 analysis examines whether the absent party is "indispensable"

8   under Rule 19(b), or whether "in equity and in good conscience" the claims can proceed without

9   the party. *Salt River Project*, 672 F.3d at 1178–79. The Court finds that the Tribe is

10  indispensable.

11       *a. Rule 19(b) Factors*

12       Before weighing factors under Rule 19(b) to determine if a party is "indispensable," the

13  Court notes that "there is a 'wall of circuit authority' in favor of dismissing actions in which a

14  necessary party may not be joined due to tribal sovereign immunity—'virtually all the cases to

15  consider the question appear to dismiss under Rule 19, regardless of whether [an alternate] remedy

16  is available, if the absent parties are Indian tribes invested with sovereign immunity." *Dine*

17  *Citizens Against Ruining Our Env't v. Bureau of Indian Affairs*, 932 F.3d 843, 857 (9th Cir. 2020)

18  (quoting *White*, 765 F.3d at 1028); *see also Kescoli v. Babbitt*, 101 F.3d 1304, 1311 (9th Cir.

19  1996) ("If the necessary party is immune from suit, there may be little need for balancing Rule

20  19(b) factors because immunity itself may be viewed as the compelling factor."). Because the

21  Tribe is a necessary party to claims regarding the Directive and holds sovereign immunity from

22  suit, there "may be little need" to balance the factors given the "wall of circuit authority"

23  dismissing relevant claims in these circumstances. *Kescoli*, 101 F.3d at 1311; *Dine Citizens*, 932

24  F.3d at 857. Against that backdrop, the Court will nevertheless balance the factors, which show

25  that the Tribe is indispensable and dismissal of certain parts claims is warranted. *Confederated*

26  *Tribes of Chehalis Indian Reservation v. Lujan*, 928 F.2d 1496, 1499 (9th Cir. 1991) ("We have

27  nonetheless consistently applied the four-part test to determine whether Indian tribes are

28  indispensable parties.") (citing cases). The factors guide the Court's determination of "whether, in

United States District Court
Northern District of California

17

1    equity and good conscience, the action should proceed among the existing parties or should be

2    dismissed."  Fed. R. Civ. P. 19(b).

3          The first factor looks at "the extent to which a judgment rendered in the person's absence

4    might prejudice that person or the existing parties."  *Id.* R. 19(b)(1).  This factor involves

5    essentially the same question as the analysis conducted in Rule 19(a).  *See Confederated Tribes*,

6    928 F.2d at 1499 ("The prejudice to the [tribe] if the plaintiffs are successful stems from the same

7    legal interests that make[] the [tribe] a necessary party to the action.").  As stated previously, the

8    Tribe would be prejudiced from a judgment in Professor Weiss's favor because the judgment

9    would extinguish Tribe's right in arguing for their contrary interpretation of CalNAGPRA that, in

10    their view, mandates the provisions of the Directive and is necessary to protect the human remains

11    of their ancestors prior to the repatriation.  *See supra* Section II.A.i.a.  Furthermore, the University

12    defendants would be prejudiced by the possibility of inconsistent obligations in the form of (1) a

13    judgment from this Court, and (2) possible lawsuits or civil penalties from the Tribe or the NAHC.

14    *See supra* Section II.A.i.b.  Professor Weiss's position—that the Tribe's interest is "attenuated"

15    and "minimal," Opp. at 8—is insultingly dismissive of the significant interests the Tribe has in the

16    deference to its views of the proper handling and treatment of the human remains of its ancestors.

17    This factor thus favors dismissal of the claims regarding the Directive.

18          The second factor examines "the extent to which any prejudice could be lessened or

19    avoided by:  (A) protective provisions in the judgment; (B) shaping the relief; or (C) other

20    measures."  Fed. R. Civ. P. 19(b)(2)(A)–(C).  At least as to claims regarding the Directive, the

21    Court divines no way to avert prejudice to the Tribe.  Professor Weiss's requested relief—

22    enjoining enforcement of the Directive as to her—is directly contrary to the Tribe's position—that

23    CalNAGPRA requires consultation with and deference to the Tribe's position on handling and

24    treatment of remains, which is reflected in the provisions of the Directive.  *See Dawavendewa v.*

25    *Salt River Project Agric. Improvement Power Dist.*, 276 F.3d 1150, 1162 (9th Cir. 2002) ("Any

26    decision mollifying [plaintiff] would prejudice the [tribe].").  Professor Weiss expresses

27    willingness to "abide by any reasonable policies or time limits" on her research and photography,

28    with the caveat that Defendants must "not deprive her of her First Amendment rights."  Opp. at

United States District Court
Northern District of California

10–11.  But it is the research and handling itself to which the Tribe objects, and the parties have a fundamental disagreement about whether the First Amendment requires Professor Weiss to have access to the remains at all.  The Court finds that it is not in a position to craft a judgment regarding claims on the Directive that can lessen or avoid prejudice to the Tribe.  The possibility of a compromise is better left to the parties and the Tribe to explore independently.  This factor thus favors dismissal.

The third factor is "whether a judgment rendered in the person's absence would be adequate."  Fed. R. Civ. P. 19(b)(3).  It would not be.  "[A]dequacy refers to the 'public stake in settling disputes by wholes, whenever possible.'"  *Pimentel*, 553 U.S. at 870 (quoting *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968)).  But the Tribe here "would not be bound by the judgment in an action where they were not [a] part[y]."  *Id.*  As Defendants say and the Court has already found, *see supra* Section II.A.i.a.1, because the Tribe is not a party here, following judgment it could file its own lawsuit against the University seeking a declaration that CalNAGPRA requires them to enforce the Directive against Professor Weiss.  Professor Weiss argues that the remains are in the custody of the University, so no injunction against the Tribe is necessary, and that she does seek to prevent the University from "consulting with" the Tribe on repatriation.  Opp. at 10.  But this argument contradicts *White*, in which a university also had custody of the remains at issue but the tribe was nonetheless found to be an indispensable party.  *White*, 765 F.3d at 1028.  This third factor thus also supports dismissal of claims regarding the Directive.

The fourth and final factor is "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  Fed. R. Civ. P. 19(b)(4).  This factor favors Professor Weiss because dismissing claims regarding the Directive would leave her without a remedy that would grant her access to the remains for research and photography prior to the repatriation.  *See White*, 765 F.3d at 1028 (fourth factor "strongly favors the plaintiffs, who would be prevented from obtaining redress for their claims").  The prejudice to Professor Weiss, however, is outweighed by the other factors.  "Courts have recognized that a plaintiff's interest in litigating a claim may be outweighed by a tribe's interest in maintaining its sovereign immunity."

1    *Confederated Tribes*, 928 F.2d at 1500; *see also Pimentel*, 553 U.S. at 872 (prejudice to party

2    "outweighed by prejudice to the absent entities invoking sovereign immunity," nothing that this

3    "result is contemplated under the doctrine of foreign sovereign immunity").  Although this factor

4    favors Professor Weiss, it is outweighed by the other factors.

5                        *b.  Public Interest Exception*

6         Professor Weiss argues that the public rights exception to Rule 19 applies to bar dismissal

7    of her claims regarding the Directive.  Opp. at 12–13.  "The contours of the public rights exception

8    have not been clearly defined," but generally "the litigation must transcend the private interests of

9    the litigants and seek to vindicate a public right."  *Kescoli*, 101 F.3d at 1311.  Professor Weiss

10   characterizes her case as seeking to "vindicate a public right . . . to academic freedom without fear

11   of retaliation for their research, publications, and speech."  Opp. at 12.  But the Court finds that

12   this case is more properly characterized as "a private one focused on the merits of [Professor

13   Weiss's] dispute rather than on vindicating a larger public interest."  *Kescoli*, 101 F.3d at 1311;

14   *see also White*, 765 F.3d at 1028 (public rights exception did not apply in NAGPRA case in which

15   professors asserted First Amendment rights).  Professor Weiss seeks access to the remains for her

16   personal research efforts.  While the Court does not doubt that Professor Weiss's academic

17   interests are genuine and her research important, those interests do not reach broadly enough to

18   "seek to vindicate a public right" as contemplated in the private rights exception.

19                            *      *      *

20        The Rule 19(b) factors lead the Court to conclude that the Tribe is an indispensable party

21   to claims regarding the Directive.

22            **iv.    Scope of Dismissal**

23        Professor Weiss's final argument is that the proper remedy is not to dismiss her entire case

24   with prejudice.  Opp. at 13.  Professor Weiss says that her claims also encompass other actions

25   that Defendants took or threatened to take, including "eliminating course release credit, tarnishing

26   her academic standing and reputation, and . . . retaliat[ing] against her if she teaches her views on

27   repatriation in her classroom."  *Id.*  As such, the Court "should allow the case to proceed focused

28   on the future threats against Professor Weiss."  *Id.*  Defendants do not respond to this argument in

United States District Court
Northern District of California

1  their reply brief.

2      The Court agrees with Professor Weiss that the Tribe is not an indispensable party to her

3  *entire* case.  The Court's analysis in this section has been focused on Professor Weiss's claims to

4  the extent they concern the Directive and Professor Weiss's access to the collection of Native

5  American remains and cultural items.  The Tribe's "claim [to] an interest" in the proper

6  interpretation of CalNAGPRA (which implicates the handling and treatment of their ancestors'

7  remains) extends to the Directive and its implementation.  The Tribe, however, does not have a

8  "claim [to] an interest" in the University's alleged restriction of access to or use of non-Native

9  American remains[4] or the alleged retaliation for her protected speech as it may pertain to her

10 teaching and curational responsibilities.  Because the Tribe does not have a "claim [to] an interest"

11 in those parts of Professor Weiss's case, the Tribe is not a necessary party to those parts of the

12 case and Rule 19 does not require dismissal.

13     Accordingly, the Court concludes that Professor Weiss's claims regarding the Directive

14 must be dismissed with prejudice because the Tribe is an indispensable party to those claims.  The

15 Tribe is not a required party, however, to Professor Weiss's claims that do not involve the

16 Directive—namely, claims regarding (1) alleged retaliation in the form of restricting access to or

17 use of non-Native American remains, and (2) alleged retaliation for her protected speech as it may

18 pertain to her teaching and curational responsibilities.  The Court will consider whether Professor

19 Weiss has adequately pleaded *those* claims in the context of Defendant's Rule 12(b)(6) motion.

20 **B.    Rule 12(b)(6) – Failure to State a Claim**

21     "A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a

22 claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation*

23 *Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d

24 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts

25

26 ───────────────

27 [4] It is unclear if the Directive applies to remains that are not Native American.  *See* Weiss Decl.
   Ex. 14 (Directive extends to "curated collections of human remains, artifacts, and funerary
   objections," not expressly cabined to Native American remains).  In an amended complaint,
28 Professor Weiss may allege that the Directive applies to non-Native American remains and
   challenge the Directive to that extent only.

as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff. *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011). However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted). While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* An "obvious alternative explanation" may render claims implausible and thus subject to dismissal. *Id.* at 682.

Because the Court has already found that claims regarding the Directive must be dismissed with prejudice under Rule 12(b)(7), it will only consider whether Professor Weiss's claims are plausibly pled as to (1) alleged retaliation in the form of restricting access to or use of non-Native American remains, and (2) alleged retaliation for her protected speech as it may pertain to her teaching and curational responsibilities.

"[T]o state a claim against a government employer for violation of the First Amendment, an employee must show (1) that he or she engaged in protected speech; (2) that the employer took 'adverse employment action'; and (3) that his or her speech was a 'substantial or motivating factor' for the adverse employment action." *Turner v. City & Cnty. of San Francisco*, 788 F.3d 1206, 1210 (9th Cir. 2015) (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). Defendants contend that Professor Weiss's complaint does not adequately plead elements (2) and (3)—that they took an "adverse employment action" against her or unconstitutionally conditioned her employment; or that Professor Weiss's speech was a "substantial or motivating factor" for their actions. MTD at 18–25. The Court evaluates these two elements.

### i.    Adverse Employment Action / Unconstitutional Conditions

An adverse employment action is an action taken by an employer that is "reasonably likely to deter employees from engaging in protected activity [under the First Amendment]." *Coszalter*,

320 F.3d at 976.  Being "bad-mouthed and verbally threatened" are not adverse employment actions, "even if taken in response to protected speech."  *Id.* at 975.  Neither are "[m]ere threats or and harsh words."  *Nunez v. City of Los Angeles*, 147 F.3d 867, 875 (9th Cir. 1998); *see also Skidmore v. Gilbert*, 2022 WL 464177, at *7 (N.D. Cal. Feb. 15, 2022), *appeal filed*, No. 22-15394 (9th Cir. 2022) (no retaliation claim where university Ph.D. student alleged only "'de facto discipline' in the form of shunning by the university community and 'threatening to deprive' [her] of her Ph.D. and 'future career opportunities'" in response to offensive comments student made on Facebook).

Professor Weiss fails to allege sufficient facts for an adverse employment action or unconstitutional conditions.  First, any argument that the "University's adoption and enforcement of the Directive" is an adverse employment action is foreclosed by the Court's holding that the Tribe is an indispensable party to that claim.  *See supra* Section II.A.

Second, several instances of Defendants expressing disagreement with Professor Weiss's viewpoints on repatriation are not adverse employment actions.  The open letter condemning her book as "anti-indigenous and racist," Compl. ¶ 20; Del Casino's statement declaring that there were "many things in the [tweet] image itself that do not align with the values of SJSU or of academic inquiry," *id.* ¶ 33; a University professor's email to a faculty listserv attaching a statement of support for the Tribe, *id.* ¶¶ 43–46; and the Anthropology Department's online statement regarding Professor Weiss's tweet, *id.* ¶ 79, are each instances of Defendants or other University officials expressing their own disagreement with Professor Weiss's positions.  None of them amount to an adverse employment action.  As this Court has previously held, the First Amendment cannot be "simultaneously use[d] . . . as a shield (to protect her own statements) and a sword (to silence the First Amendment rights of professors to respond)."  *Skidmore*, 2022 WL 464177, at *11 ("The academic freedom doctrine protects the professors' rights to comment [in response to plaintiff's] Facebook post, just as the First Amendment protects [plaintiff's] right to make her Facebook post in the first place.").

Professor Weiss makes much of Gonzalez's statements on a Zoom event in early June 2021 entitled "What to Do When a Tenured Professor is Branded a Racist," but as Defendants

argue she has not plausibly pleaded these remarks amounted to an adverse employment action or imposition of unconstitutional conditions.  *See* MTD at 24–25; *see also* Weiss Decl. Ex. 5 (transcript of the event).[5]  Furthermore, the Court agrees with Defendants that Professor Weiss has mischaracterized Gonzalez's statements.  Gonzalez begins his remarks by stating his personal disagreement with her position and his opinion that her *argument* "borders on . . . professional incompetence" because it was "scientifically shaky."  Weiss Decl. Ex. 5 at 8:1–4, 17–19; 40:9.  While Professor Weiss alleges that Gonzalez was threatening to prevent her teaching her views on repatriation in the classroom, Gonzalez in fact defended her right to speak and teach on the topic.  *Id.* at 10:1–7 ("[S]he writes a controversial book . . . that [is], you know, at the heart of – of the idea of academic freedom is that even ideas that are impolitic or unpopular, you know, need to be voiced or need to be . . . expressed."); *id.* at 14:1–2 (email to listserv conveyed "a reminder that this is what academic freedom is").  Gonzalez's statements about restricting teaching topics were in fact responding to a question about whether he would take action if someone was "exposing students to . . . white supremacy . . . in the classroom."  *Id.* at 39:20–22 (question about white supremacy), 39:23–40:20 (response about "a very different approach to this" if that was the case).  Finally, even if Professor Weiss's characterization of Gonzalez's remarks was plausible, she has not alleged that Gonzalez is in any position to act upon the alleged threats and actually take concrete adverse employment action against her (or impose concrete conditions on her teaching).  When Professor Weiss expressed concerns to Gonzalez, he told her that University policy "ensures the preservation of academic freedom" and that he would "continue upholding it as long as [he was] affiliated with the University."  Weiss Decl. Ex. 6; *see also* Compl. ¶ 28.

Third, Professor Weiss also alleges that she has lost curational responsibilities as a result of the Directive, which may result in losing teaching credit that she previously received for curation

---

[5] The Court may consider documents not attached to the complaint "if the documents' authenticity . . . is not contested and the plaintiff's complaint necessarily relies on them."  *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001).  The Court agrees with Defendants that the full transcript of Gonzalez's remarks at this webinar and Gonzalez's email response to Professor Weiss are incorporated into the Complaint by reference.  Professor Weiss has submitted the transcript and email herself with her motion for a preliminary injunction, so their "authenticity . . . is not contested."  *Id.*; *see also* Weiss Decl. Exs. 5, 6.  And she refers to Gonzalez's remarks and email specifically in her complaint.  *See* Compl. ¶¶ 23–29.

United States District Court
Northern District of California

1    and lead to her having to take on additional teaching responsibilities.  Compl. ¶¶ 76–78.  But

2    Professor Weiss has not adequately alleged whether the loss of her curational responsibilities

3    relates solely to Native American remains and cultural items or extends to other collections

4    maintained by the University.  Furthermore, Professor Weiss does not allege any actual loss of

5    teaching credit or adequate facts supporting a plausible inference that she will lose them in the

6    future.  Professor Weiss must fix these deficiencies in an amended complaint to take this course of

7    conduct outside the scope of the Directive.

8         Finally, Professor Weiss alleges that she has also been denied access to non-Native

9    American remains (the Carthage Collection), and when she was granted access, that she was only

10   allowed to access the remains outside the curational facility in "poor research conditions."  Compl.

11   ¶¶ 65–73.  Because Professor Weiss seeks only injunctive relief and nominal damages in her

12   existing complaint, the Court focuses the analysis on Professor Weiss's current restrictions on

13   access to the Carthage Collection in "poor research conditions."  Professor Weiss alleges that the

14   Directive covers non-Native American remains, Compl. ¶ 65, but she also alleges (and the Court

15   has found) that there can be no plausible claims that restrictions on non-Native American remains

16   are within the scope of NAGPRA or CalNAGPRA such that the Tribe would be an indispensable

17   party to those claims.  *See supra* Section II.A.iv; Compl. ¶¶ 65–66.  Still, Professor Weiss has

18   alleged that the curational facilities house Native American remains and are thus within the scope

19   of the restrictions imposed by the Directive.  In an amended complaint, Professor Weiss must

20   attempt to state a claim based on restrictions not applicable to Native American remains.

21   Professor Weiss has not sufficiently alleged an adverse action or unconstitutional conditions.

22              **ii.    Substantial or Motivating Factor**

23         Moreover, even assuming that Professor Weiss had adequately alleged an adverse

24   employment action or unconstitutional conditions, she has not adequately alleged that her speech

25   was a "substantial or motivating factor" in taking those actions.  There are three ways to show that

26   speech was a "substantial or motivating factor" for an adverse employment action:  (1) proximity

27   in time between the protected action and the adverse employment action; (2) expression of

28   opposition to speech; or (3) false and pretextual explanations for the adverse employment action.

25

*See Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 751 (9th Cir. 2001).  The Court examines each in turn.

Proximity in Time.  The parties focus much of their argument regarding the proximity factor on the proximity between Professor Weiss's tweet and adoption of the Directive.  *See* MTD at 18–19, Opp. at 14–17.  The Court has found claims regarding the Directive are subject to dismissal, and so need not address those arguments.  For other courses of conduct, the Court finds that Professor Weiss's own allegations create an "obvious alternative explanation" for the University's actions.  *Iqbal*, 556 U.S. at 682.  Professor Weiss alleges that she has made her views on repatriation clear "for years without controversy" at the University.  Compl. ¶ 21.  Indeed, Professor Weiss says that she was "commended" by Gonzalez for her "ability to 'spark lively discussions among various stakeholders' and to 'boost the departments national reputation as a center that fosters creative and unorthodox viewpoints on important issues.'"  *Id.*  Defendants' alleged statements expressing opposition to her speech—which the Court has already found are not adverse employment actions—began after her 2020 book was published.  *See id.* ¶¶ 22–31.  The concrete actions that Professor Weiss has alleged—reduction in curational responsibilities, possible reduction in teaching credit, and restricted access to the non-Native American remains outside of the curational facilities—all took place after her tweet was posted and the Directive was adopted.  As currently pleaded, the "obvious alternative explanation" is that her tweet prompted the University to reevaluate compliance with CalNAGPRA and institute additional restrictions that caused incidental effects on Professor Weiss.  In an amended complaint, Professor Weiss must allege additional facts supporting the alternative inference that any adverse employment action or imposition of unconstitutional conditions were in proximity to protected speech.

Expression of Opposition.  For this method of alleging that speech was a substantial or motivating factor in an adverse employment action, Professor Weiss must allege that Defendants expressed opposition to Professor Weiss's speech *itself*, not that they expressed opposition to the opinions she actually expressed.  Warnings to cease speaking on a topic are expressions of opposition to speech.  *See Schwartzman v. Valenzuela*, 846 F.2d 1209, 1212 (9th Cir. 1988) (memorandum from employer "warning him that he was not authorized to speak out" was

sufficient evidence that employer expressed opposition to speech); *see also Allen v. Scribner*, 812 F.2d 426, 434–35 (9th Cir. 1987) (same, as to evidence that employer told co-workers of plaintiff that plaintiff should be terminated because he expressed his opinions).  But here again Professor Weiss's own allegations that Defendants supported her expressing her opinions "for years" doom her arguments on this element.  Defendants' expressions of disagreement about the *content* of her speech are not expressions to *the fact of her speaking out*.  *Contra* Opp. at 17–18 (citing expressions of disagreement).  As the Court has previously found, Gonzalez's statements when taken in context do not create a plausible claim that he was seeking to limit her ability to teach her views on repatriation in the classroom, and thus do not amount to expression of opposition to speaking out on those opinions.  *See supra* Section II.B.i.  This method is not plausibly pleaded.

        <u>False and Pretextual Explanations</u>.  Here again the parties' briefing focuses on the allegations regarding the Directive that the Court has found are subject to dismissal.  *See* MTD at 21–23; Opp. at 18–19.  The sole mention of pretext in the Complaint is a quote to a case in a paragraph citing the Directive.  *See* Compl. ¶ 38.  Accordingly, the Court finds that Professor Weiss has not adequately alleged a false or pretextual explanation for the University's actions unrelated to the Directive.

### iii.    Leave to Amend

        The Court will now consider whether to grant Professor Weiss leave to amend.  The factors considered when determining whether to grant leave to amend include: "(1) bad faith on the part of the movant; (2) undue delay; (3) prejudice to the opposing party; and (4) futility of the proposed amendment."  *Ciampi v. City of Palo Alto*, 2010 WL 5174013, at *2 (N.D. Cal. Dec. 15, 2010) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).  The Court finds that Professor Weiss has not engaged in bad faith or undue delay, and that an opportunity to amend within a certain scope will not prejudice Defendants.

        Nor does the Court find that amendment on certain types of allegations would be futile.  As the Court has already stated, the Tribe is an indispensable party to any claims regarding the adoption or implementation of the Directive insofar as it applies to Native American remains.  Amendment of the claims challenging those courses of action would be futile, and so leave to

1   amend those types of allegations will be denied.  Leave to amend her allegations regarding (1)

2   retaliation in the form of restricting access to or use of non-Native American remains, and (2)

3   retaliation for her protected speech as it may pertain to her teaching and curational responsibilities,

4   however, would not be futile.  Professor Weiss may face challenges in asserting factual support for

5   these courses of conduct to take them outside of the scope of the Directive, but leave to amend

6   "should be granted if it appears at all possible that [Professor Weiss] can correct the defect[s]"

7   identified.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1108 (9th Cir. 2003).  Leave to amend

8   will accordingly be granted to allow Professor Weiss to take those alleged actions outside the

9   scope of the Directive.

10  **III.   MOTION FOR A PRELIMINARY INJUNCTION**

11        A plaintiff seeking preliminary injunctive relief must establish "[1] that [s]he is likely to

12  succeed on the merits, [2] that [s]he is likely to suffer irreparable harm in the absence of

13  preliminary relief, [3] that the balance of equities tips in h[er] favor, and [4] that an injunction is in

14  the public interest."  *Winter*, 555 U.S. at 20.  "[I]f a plaintiff can only show that there are serious

15  questions going to the merits – a lesser showing than likelihood of success on the merits – then a

16  preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's

17  favor, and the other two *Winter* factors are satisfied."  *Friends of the Wild Swan v. Weber*, 767

18  F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

19        The Court need not extensively discuss Professor Weiss's motion for a preliminary

20  injunction.  Her motion seeks an injunction (1) preventing enforcement of the Directive "to restrict

21  [her] access to the curation facilities to conduct research and ban her photography of remains;"

22  and (2) barring Defendants from "engaging in any further retaliatory actions against [her] . . . such

23  as removing Professor Weiss from the classroom, altering her courses, or preventing her from

24  expressing her views on repatriation to students."  *See* ECF No. 8 (proposed order).

25        "Failure to plausibly allege a claim can bar a finding of likelihood of success on the merits

26  in the preliminary injunction inquiry."  *Nicolosi Distrib., Inc. v. FinishMaster, Inc.*, 2018 WL

27  4904918, at *5 (N.D. Cal. Oct. 9, 2018); *see also Doe v. Fed. Dist. Ct.*, 467 F. App'x 725, 728

28  (9th Cir. 2012) ("Because Doe's complaint was insufficient to survive a motion to dismiss for

failure to state a claim, she could not show a strong likelihood of success on the merits.").  The

Court has already found under Rule 12(b)(6) that Professor Weiss has failed to state a claim upon

which relief can be granted.  She accordingly has not shown a likelihood of success on the merits.

Because Professor Weiss has not shown a likelihood of success on the merits, the Court need not

reach the other factors in the *Winter* analysis and will deny the motion for a preliminary

injunction.  *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009).[6]

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

- Defendants' motion to dismiss is GRANTED IN PART for failure to join a
  required party and IN PART for failure to state a claim upon which relief can be
  granted pursuant to Rules 12(b)(7) and 12(b)(6); and

- Professor Weiss's motion for a preliminary injunction is DENIED.

Professor Weiss is granted LEAVE TO AMEND her complaint as to her allegations about

retaliation in the form of restricting access to or use of non-Native American remains and cultural

items and retaliation for her protected speech as it may pertain to her teaching and curational

responsibilities unrelated to Native American items subject to NAGPRA and CalNAGPRA.

Leave to amend is DENIED as to Professor Weiss's claims as far as they challenge the Directive's

applicability to Native American remains and cultural items.

Professor Weiss SHALL file an amended complaint **no later than 30 days from this

Order**.  Failure to meet the deadline to file an amended complaint or failure to cure the

deficiencies identified in this Order will result in a dismissal of Professor Weiss's claims with

prejudice.  Leave to amend is limited to the defects addressed in this Order.  Professor Weiss may

not add new claims or parties absent leave of Court.

Dated:  May 10, 2022

_____
BETH LABSON FREEMAN
United States District Judge

---

[6] The Court thus need not adjudicate Defendants' objections to Professor Weiss's purportedly
improper reply evidence.  ECF No. 52.  The objections are OVERRULED AS MOOT.

United States District Court
Northern District of California